STATE OF NORTH CAROLINA v. JAMES JUNIOR LADD

No. 164A81

(Filed 3 May 1983)

1. Searches and Seizures § 44— motion to suppress evidence—findings of fact not necessary

The necessary factual findings were implied by the trial judge's ruling denying defendant's motion to suppress a jacket and money seized by officers from defendant's trailer at the time of his arrest where the uncontradicted evidence showed that the officers observed the coat with money sticking out of it in plain view, and the only conflict in the evidence concerned the immaterial fact as to whether this occurred in the living room or a nearby bedroom. Therefore, the trial court did not err in failing to make findings of fact in denying the motion to suppress.

2. Criminal Law § 75.7— statement by deputy—no custodial interrogation

A deputy's reply to defendant's inquiry as to why he was being arrested that defendant knew why did not constitute "interrogation" within the purview of the *Miranda* decision, since the deputy had no reason to anticipate that defendant would suddenly be moved to make an incriminating response. Therefore, defendant's subsequent statement that he did know why the police were there was properly admitted although defendant was in custody and had

not been given the *Miranda* warnings at the time he made the statement. G.S. 15A-401(c)(2)c.

3. **Criminal Law §§ 75.4, 75.12— custodial interrogation—statement invoking right to counsel—inadmissibility**

Defendant's statement during custodial interrogation after being given the *Miranda* warnings that "I don't want to say where the rest of the money is now, but I will tell you where the rest of the money is after I talk to my lawyer," invoked defendant's right to counsel, and the trial court properly ruled that statements made by defendant after that point and evidence seized as a result of such statements were inadmissible. However, the trial court erred in admitting testimony concerning defendant's statement that he would reveal the location of the rest of the money after consulting with counsel, since it is constitutionally impermissible to admit testimony relating to defendant's exercise of his right to counsel during custodial interrogation, but such error was harmless beyond a reasonable doubt in the light of the overwhelming evidence of defendant's guilt of the crimes charged.

4. **Criminal Law § 75.7— informational questions during booking—no custodial interrogation**

Routine informational questions asked a defendant during the booking process which are not reasonably likely to elicit an incriminating response do not constitute interrogation within the purview of the *Miranda* decision.

5. **Criminal Law § 75.7— question during booking—custodial interrogation**

An officer's question to defendant during the booking process as to the location of his driver's license constituted continued custodial interrogation after a request for counsel, and defendant's reply that he had lost his license should have been suppressed, where the officer knew that defendant's wallet containing his driver's license had been found at the crime scene and was in police custody, and the only logical reason for the question was the hope of eliciting an incriminating reply from defendant.

6. **Criminal Law § 135.4— constitutionality of death penalty statute**

The procedure set out in G.S. 15A-2000(a)(2) for death qualifying a jury prior to the guilt phase of a trial and permitting the same jury to hear both the guilt and penalty phases of the trial is constitutional.

APPEAL by defendant from *Davis, Judge*, at the 17 August 1981 Criminal Session of SURRY County Superior Court.

Defendant was arrested on 27 November 1980 pursuant to warrants charging the murders of Johnny Parks Henderson and David Edward. He was indicted for these crimes by the Yadkin County grand jury in January 1981. On 21 April 1981, he was also indicted for the armed robbery of Johnny Parks Henderson.

Prior to trial, defendant moved for a change of venue, citing pretrial publicity as the reason for his request. On 30 April 1981,

Judge Long granted this motion and the cases were transferred to Surry County for trial. The trial came on to be heard before Davis, J., and a jury at the 17 August 1981 Special Session of Surry County Superior Criminal Court. Upon motion of the State, the three offenses were consolidated for trial.

Defendant made a motion to suppress all statements given and evidence seized during the arrest and booking procedure. The trial judge ruled that all of the statements and evidence could be introduced with the exception of $1,400 taken from defendant's home. The trial court ruled that this evidence must be suppressed because it was obtained by the police in response to questions posited to defendant after he had requested an attorney. In so ruling, the trial court failed to make any written findings of fact and conclusions of law regarding the evidence sought to be suppressed.

The State's evidence presented during the guilt phase of the trial tended to show that on election day in early November, 1980, defendant was at the Windsor's Crossroads Community Building, a polling site for the regularly scheduled election. The deceased's father, Parks Henderson, was standing on the lawn nearby. Mark Hardy, a friend of defendant, testified that defendant turned to him and said that "he didn't have no use for Parks or Johnny Henderson and some day they would just run into the wrong person."

Several weeks later, on 25 November, defendant went to work on his brother-in-law's farm. The arrangement between the two was that defendant would do some chores and the brother-in-law, James (Sammy) Hall, would give him dinner and a small amount of money for cigarettes and other personal items. Sammy testified that other than this small sum, defendant had no money that day. When defendant finished his chores, Sammy drove him to the home of defendant's parents, Mr. and Mrs. Ladd. Sammy testified that on the way to the Ladds', defendant confided that he and Ricky Williams "was thinking about knocking Johnny in the head and getting some money off of him." Sammy warned him not to go near the Henderson farm and to stay at home. Sammy also stated that about a week or so earlier, he had loaned his 30/30 Winchester rifle to defendant's father to go deer hunting.

Defendant and his wife resided with her stepparents. Ben Cass, defendant's stepfather-in-law, testified that defendant spent the night of 25 November at home. He further testified that on the morning of the 26th, he overheard defendant and his wife discussing the fact that defendant had no money. Defendant reassured her that he would get some that day. He then told the family that he was going to work and left the Cass residence around 8:00 a.m. riding his bicycle. Sammy Hall said that defendant did not report for work.

About two hours later, Theodore Wallace saw defendant at Wallace's store. Ricky Williams, an acquaintance of defendant, pulled into the parking lot of the store and asked defendant if he wanted a ride. Defendant said yes, and directed Ricky to take him to his mother's home. The two then loaded the bicycle in the trunk and drove to the Ladd home. Defendant went inside and returned a few minutes later carrying a rifle. Ricky testified that as defendant climbed back into the car, he told Ricky that "he knew somebody he could knock off." At the time, Ricky thought he was kidding and took it as a joke.

Defendant then asked Ricky to take him by a friend's house. Following defendant's directions, Ricky took several turns and then stopped not far from the driveway to the Henderson farm. Ricky testified that defendant took a pair of gloves from under the seat of the car and said that he was going hunting. Defendant then left the automobile carrying the rifle.

Miles Johnson, a mailman, testified that he rode by and saw the two men seated in Williams' car on the shoulder of the road. At about 11:30 a.m., the Williams' car passed him, with only the driver in the car.

On the same morning, Johnny Henderson was at work doing the chores at the Henderson farm. He planned to attend a cattle sale in a nearby town that afternoon. His friend, David Edward, was to go along. Johnny contemplated purchasing cattle at the sale and he was carrying approximately $9,000 for that purpose. He met David around 11:00 a.m. and, shortly thereafter, the two started to the barn to load cattle. Parks Henderson, Johnny's father, last saw the two around 12:30 p.m. as they were going toward the barn.

Around 1:00 p.m., as Parks was helping his wife unload some groceries, he heard two shots from a high-powered rifle. He remarked to his wife at the time that it was unusual for Johnny to be shooting around the barn while he was loading cattle. His wife then asked him to take some bread to a neighbor's house. As he was leaving on the errand, he noticed someone walking near the barn. He testified that the person was short, five feet or less, and wore a "dull" colored coat. Parks thought the individual might have been David Edward. Other testimony indicated that defendant was five feet, five inches tall.

When Parks returned to the Henderson farm, he became alarmed when he learned his son had not yet returned from the barn. He ran to the barn and there discovered the bodies of his son and David Edward lying on the floor. Both had been shot in the neck with a rifle. Johnny's money was gone.

Parks Henderson returned to the house and phoned his son, Jack Henderson, the Sheriff of Yadkin County. After officers arrived at the scene, they conducted a search of the area. About five and one-half inches from Johnny Henderson's body, a copper jacket was found lodged in a piece of wood. By use of a metal detector, the officers located a piece of lead on the floor of the barn. The copper jacket and lead fragment were later submitted to the State Bureau of Investigation for analysis, along with a 30/30 Winchester rifle recovered from the Ladd residence. Stephen Carpenter, a firearms expert, testified that the lead fragment was consistent with the lead core of metal-jacketed 30 caliber bullets. After test firing the 30/30 Winchester, Carpenter was of the opinion that the copper jacket found in the barn had been fired from the Winchester rifle.

Another item recovered from the area near the Henderson barn was a wallet containing defendant's driver's license and social security card.

Anne Hardy, a neighbor of the Henderson's testified that at approximately 12:30 p.m. she also heard two gunshots which sounded like they were from a high-powered rifle. Shortly afterward, she saw someone walking along the edge of the woods, coming from the direction of the Henderson farm. She recalled that the person was ducking in and out of the woods, as if he was trying to hide. She noticed that the individual carried a rifle and

remembered that he held his hand over his jacket pocket. Mrs. Hardy first testified that she did not recognize the person, although she did say that he was about the same height and weight as defendant. Several days after she testifed at trial, however, Mrs. Hardy notified the prosecutor that she had more to say. She was then recalled and testified that she was sure the person in the woods was defendant. She stated that she came to realize it was defendant when she saw his picture in the newspaper two days after the crimes were committed. She was afraid to admit this when she first testified. She conceded that she did not see the face of the man in the woods, but she was sure it was defendant for she had known him all her life.

Harold Sparks remembered that defendant came to his house on a bicycle at about 2:00 p.m. on the afternoon of 26 November. Defendant told Sparks that he had come to return five dollars that he had borrowed several months before. He also offered Sparks an extra dollar if he would take him home. Sparks agreed, and after loading the bicycle into the trunk of the car, drove defendant to the Cass residence.

When defendant arrived home, he remarked to his wife, "I told you I was going to get that money." He explained that his cousin, J. Roy, had given him some cash. Later that afternoon, the Cass family went into Statesville to go shopping. Defendant bought a $200 stereo and a large teddy bear. He gave his wife money to buy Christmas presents and offered to buy Mr. Cass anything he wanted. He also treated the family to dinner and paid for some groceries. J. Roy later testified that he had not given defendant any money.

Defendant offered no evidence.

The jury found defendant guilty of the first-degree murder and armed robbery of Johnny Parks Henderson and the second-degree murder of David Edward. Thereafter, a sentencing hearing was conducted for the first-degree murder verdict. The jury could not unanimously agree on the sentence to be imposed. The trial court therefore imposed a life sentence for the first-degree murder as required by G.S. 15A-2000(b). Defendant also received sentences of life imprisonment for both the second-degree murder and armed robbery crimes. All three sentences were to run con-

State v. Ladd

secutively. Defendant appealed directly to this Court as a matter of right pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Elizabeth C. Bunting, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Ann B. Petersen, Assistant Appellate Defender, for defendant-appellant.*

BRANCH, Chief Justice.

[1]   We first consider defendant's contention that he is entitled to a new trial because of the trial judge's failure to make findings of fact to support his ruling denying defendant's motion to suppress.

The legal principles governing this issue are well settled. At the close of the *voir dire* hearing, it is incumbent upon the trial judge to make findings of fact to support his ruling regarding admissibility of the evidence sought to be suppressed. *See, e.g., State v. Phillips,* 300 N.C. 678, 268 S.E. 2d 452 (1980); *State v. Riddick,* 291 N.C. 399, 230 S.E. 2d 506 (1976). If there is a material conflict in the *voir dire* evidence, the trial judge *must* make such factual findings to resolve the conflict and to reflect the bases for his ruling. If, however, any conflicts in the evidence are *immaterial* and have no effect on admissibility, it is not error to omit factual findings, although it is the better practice to find all facts upon which the admissibility of the evidence depends. *State v. Phillips* at 685, 268 S.E. 2d at 457; *State v. Riddick* at 409, 230 S.E. 2d at 512-13. When the only conflicts in the evidence are immaterial, the necessary findings may be implied from the admission of the challenged evidence. *Id.*

In instant case, each of the officers and detectives testified as to the events occurring on the night of defendant's arrest. The only discrepancy in their testimony cited by defendant related to the *location* of a jacket seized by the officers from defendant's trailer.

Two officers, Haynes and Davis, were in the trailer when the jacket was seized and both testified on *voir dire.* Davis remembered the jacket as being on a table to the left of the front door, while Haynes' recollection was that it was lying across a dresser in a bedroom to the right.

The exact location of the jacket does not affect the admissibility of this evidence. The critical testimony, elicited from both officers, was that defendant picked up the coat and hastily dropped it. As he did so, the police noticed money sticking out of one of the pockets. This plain view observation, regardless of whether it took place in the living room or a nearby bedroom, clearly supported the admission of these items into evidence.

We hold that this conflict in evidence was immaterial and therefore the necessary factual findings were implied by the trial judge's ruling. We find no error in the admission of the coat and the money retrieved from the trailer.

We next consider defendant's contention that the trial court erred by admitting into evidence three statements he made to the police during the course of his arrest. Defendant's contentions with respect to the admissibility of each statement will be considered separately.

[2] The first statement was made by defendant when he was initially apprehended and before he had been advised of his *Miranda* rights. The testimony given by the arresting officers on *voir dire* indicated that at about 2:00 a.m. on 27 November 1980, defendant answered the officers' knock at the door of his trailer and was informed that he was under arrest. As the police began a search of his person for weapons, defendant asked, "What for?" Deputy Haynes responded, "You know why." Defendant then offered the following comment: "Yeah, just don't wake up my family. I don't want them to know." Defendant maintains that this reply was in response to interrogation by Deputy Haynes and should have been excluded because defendant was in custody and had not yet abeen advised of his *Miranda* rights.

Initially, we note that the officer's indirect response to defendant's query as to why he was being arrested was in violation of G.S. 15A-401(c)(2)c. That statute provides that an arresting officer must *"as promptly as is reasonable under the circumstances,* inform the arrested person of the cause of the arrest, unless the cause appears to be evident."* (Emphasis added.) Although defendant was thereafter advised of the reason for his detention, Deputy Haynes should have directly and truthfully answered defendant's question at the time it was asked. The officer's "quip" does not, however, amount to interrogation simply

because the statute requires a more forthright answer than the one given.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), the United States Supreme Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to protect a defendant's constitutional privilege to be free from compulsory self-incrimination. Generally, a suspect must be advised of his rights to remain silent, to have a lawyer present during interrogation, and to stop police questioning at any time he chooses. *Id.* at 479, 16 L.Ed. 2d at 726, 86 S.Ct. at 1630. *See also State v. Riddick*, 291 N.C. 399, 230 S.E. 2d 506 (1976).

In the case before us, all parties agree that defendant was in custody at the time he made this statement to the police. He had been arrested and was being physically searched for weapons when he admitted that he knew why the police were there. It is also apparent that defendant had not been given *Miranda* warnings before this exchange took place.

*Miranda* warnings are not required, however, when a defendant is simply taken into custody. *State v. Holcomb*, 295 N.C. 608, 247 S.E. 2d 888 (1978); *State v. Blackmon*, 284 N.C. 1, 199 S.E. 2d 431 (1973); *State v. Fletcher*, 279 N.C. 85, 181 S.E. 2d 405 (1971). The defendant in custody must also be subjected to *interrogation.* " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300, 64 L.Ed. 2d 297, 307, 100 S.Ct. 1682, 1689 (1980). We must determine, then, whether the deputy's reply to defendant's question amounted to interrogation, for only then would the *Miranda* proscriptions apply.

We begin with the recognition that interrogation is not limited to express questioning by the police.[1] *See Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed. 2d 297, 100 S.Ct. 1682 (1980); *Brewer v. Williams*, 430 U.S. 387, 51 L.Ed. 2d 424, 97 S. Ct. 1232 (1977).

---

1. "To limit the ambit of *Miranda* to express questioning would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda.*'" *Rhode Island v. Innis*, 446 U.S. at 299 n. 3, 64 L.Ed. 2d at 307 n. 3, 100 S.Ct. at 1689 n. 3 (quoting *Commonwealth v. Hamilton*, 445 Pa. 292, 297, 285 A. 2d 172, 175 (1971)).

Thus, Deputy Haynes' comment is not definitionally something other than interrogation simply because it is not punctuated by a question mark. The term "interrogation" under *Miranda* also refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis*, 446 U.S. at 301, 64 L.Ed. 2d at 308, 100 S.Ct. at 1689-90 (emphasis added).

Defendant argues that Haynes' statement was an accusation that defendant committed the crime for which he was being arrested. He attempts to characterize his exchange with the police as equivalent to that which occurred in *United States v. Jordan*, 557 F. 2d 1081 (5th Cir. 1977). In that case, the Fifth Circuit held that an officer's accusation that the defendant was in possession of a sawed-off shotgun constituted interrogation. *Id.* at 1083.

We are of the opinion that the situation presented in instant case is factually distinguishable from *Jordan*. Deputy Haynes' statement to defendant was certainly not a direct accusation that defendant had murdered Johnny Henderson. In *Jordan*, the officer's accusatory statement clearly was intended to elicit an incriminating response. In contrast, Deputy Haynes' statement to defendant was not particularly evocative. The deputy's short response to defendant's inquiry was, in our estimation, a relatively innocuous comment that does not constitute "interrogation" as envisioned by *Miranda*. The *Innis* Court recognized that "the police surely cannot be held accountable for the unforeseeable results of their words or actions, . . . ." *Rhode Island v. Innis*, 446 U.S. at 301-02, 64 L.Ed. 2d at 308, 100 S.Ct. at 1690.

We conclude that in making this off-hand remark, the deputy had no reason to anticipate that defendant would suddenly be moved to make a self-incriminating response. We hold that defendant's statement was not made in response to interrogation by Deputy Haynes and was therefore properly admitted into evidence.

[3] We next consider defendant's objections to the admission into evidence of a second statement made to the police on the evening of his arrest.

Shortly after he was taken into custody, defendant was advised of his *Miranda* rights and stated that he understood them.

When asked whether he would talk with the officers, defendant replied, "Yeah, but not here." Defendant was then placed in a patrol car where S.B.I. Agent Foster stated that he wanted to talk to defendant about the warrant. Defendant answered, "Okay." Agent Foster then began questioning defendant about the events of the previous day. He asked defendant about the rest of the money,[2] to which defendant replied that there was no more money. When further questioned, defendant stated, "I don't want to say where the rest of the money is now, but I will tell you where the rest of the money is after I talk to my lawyer." Foster stopped questioning defendant and got out of the car. Detective Davis continued the interrogation, urging defendant to do something right for once in his life and tell where the rest of the money was. Finally, defendant relented and led the police to $1,400 tucked under a mattress in the Cass's bedroom.

The trial judge ruled that defendant's statement regarding consultation with an attorney was an invocation of his right to counsel. All evidence obtained pursuant to continued interrogation after defendant's exercise of this privilege was therefore ruled inadmissible. The officers were permitted to testify, however, as to defendant's statement that he was willing to reveal the location of the money after speaking with an attorney.

We agree with the trial court's conclusion that defendant invoked his right to counsel when he asked to postpone further discussion about the money until he spoke with his lawyer. In *Edwards v. Arizona*, 451 U.S. 477, 479, 68 L.Ed. 2d 378, 382, 101 S.Ct. 1880, 1882 (1981), the defendant said he wanted an attorney before making a deal. Similarly, in *Brewer v. Williams*, 430 U.S. 387, 392, 51 L.Ed. 2d 424, 432, 97 S.Ct. 1232, 1236, the defendant said several times that he would tell the whole story after he spoke with his attorney. In both instances, the Supreme Court recognized these statements to be an expression of the defendant's right to counsel. We conclude that in this case, defendant's desire to speak with counsel before further interrogation was as clearly expressed as in *Edwards* and *Brewer*. Judge Davis's rul-

---

2. Moments earlier, the police had obtained a jacket belonging to defendant with $600 in the pocket when they accompanied defendant inside to get a hat and shoes.

ing that all statements made and evidence seized after that point were inadmissible was therefore clearly correct.

We must disagree, however, with the trial court's decision to admit defendant's statement that he would reveal the location of the rest of the money after consulting counsel.

We have consistently held that the State may not introduce evidence that a defendant exercised his fifth amendment right to remain silent. *See State v. McCall,* 286 N.C. 472, 212 S.E. 2d 132 (1975); *State v. Castor,* 285 N.C. 286, 204 S.E. 2d 848 (1974). We must now determine whether it is also constitutionally impermissible to permit testimony relating to the defendant's exercise of his right to counsel during custodial interrogation.

In *Baker v. United States,* 357 F. 2d 11 (5th Cir. 1966), the Fifth Circuit Court of Appeals held that the trial court committed reversible error in permitting an F.B.I. agent to testify that the defendant declined to give a statement in the absence of counsel. The court observed that the defendant had exercised a constitutional right by declining to speak until after consulting an attorney. *Id.* at 13. Proof that he refused to make a statement upon being questioned by the F.B.I., the court said, was as objectionable as it would have been to comment on a defendant exercising his constitutional right not to testify at trial. *Id.* at 13-14.

The defendant in *United States v. Faulkenbery,* 472 F. 2d 879 (9th Cir.), *cert. denied,* 411 U.S. 970, 36 L.Ed. 2d 692, 93 S.Ct. 2161 (1973) raised a similar argument. In that case, the defendant contended that his fifth amendment privilege was violated when an officer was permitted to testify that defendant had asserted his right to counsel during interrogation. The Ninth Circuit agreed with defendant's contention and held that the officer's comment was constitutionally impermissible.[3]

We acknowledge that the right to counsel under the fifth amendment is afforded a defendant "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda,* 384 U.S. at 469, 16 L.Ed. 2d at 721, 86 S.Ct. at 1625. Therefore, a

---

3. Because the evidence presented against the defendant was overwhelming, the court concluded that the illegally admitted evidence did not contribute to the verdict and was not, therefore, reversible error. 472 F. 2d at 881.

defendant *must* be permitted to invoke this right with the assurance that he will not later suffer adverse consequences for having done so. We agree with Justice Black's statement that there are "no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them." *Grunewald v. United States*, 353 U.S. 391, 425, 1 L.Ed. 2d 931, 955, 77 S.Ct. 963, 984-85 (1956) (Black, J., concurring).

Accordingly, we hold that the trial court erred in admitting into evidence defendant's statement that he would tell where the rest of the money was after he talked to his lawyer. By giving the *Miranda* warnings, the police officers indicated to defendant that they were prepared to recognize his right to the presence of an attorney should he choose to exercise it. Therefore, we conclude that the words chosen by defendant to invoke this constitutional privilege should not have been admitted into evidence against him.

Because this statement was introduced in violation of defendant's constitutional rights under the fifth and fourteenth amendments, he is entitled to a new trial unless we determine that the erroneous admission of this evidence was harmless beyond a reasonable doubt. G.S. 15A-1443(b). *See Chapman v. California*, 386 U.S. 18, 24, 17 L.Ed. 2d 705, 710-11, 87 S.Ct. 824, 828 (1967). To find harmless error beyond a reasonable doubt, we must be convinced that there is no reasonable possibility that the admission of this evidence might have contributed to the conviction. *Fahy v. Connecticut*, 375 U.S. 85, 86-87, 11 L.Ed. 2d 171, 173, 84 S.Ct. 229, 230 (1963). *See also State v. Castor*, 285 N.C. 286, 292, 204 S.E. 2d 848, 853 (1974).

Upon the facts presented in instant case, we are satisfied that the erroneous admission of this evidence was harmless beyond a reasonable doubt.

The evidence of defendant's guilt was overwhelming. There was direct testimony that defendant had previously threatened the Hendersons and that he was badly in need of money. Ricky Williams testified that on the morning of November 26th, he drove defendant to the Henderson farm. Defendant alighted from Williams' vehicle carrying a 30/30 Winchester rifle. Ballistics tests

revealed that the victims were killed with bullets that were probably fired from that rifle. The police testified that when searching the area around the barn shortly after the crimes occurred, they recovered a wallet containing defendant's driver's license and social security card. Equally critical was the testimony of the Henderson's neighbor who spotted defendant trying to hide in the underbrush while making his way from the direction of the barn.

Perhaps the most damaging circumstance was defendant's mysterious acquisition of a large sum of money, evidenced by his extravagant shopping spree and the $600 found in his coat pocket on the night of the arrest. This evidence was even more damning when coupled with the fact that defendant lied to his family about how he had acquired this small fortune. Finally, defendant also exhibited guilty knowledge when he admitted to the police that he knew why they had come to arrest him.

We hold that the erroneous admission of this evidence was harmless error beyond a reasonable doubt.

The third and final statement challenged by defendant was made as he was being "booked" at the Surry County jail. Agent Perry asked defendant routine questions in an effort to elicit information necessary to the booking process, including his name, address and age. The officer then routinely asked defendant for his driver's license number. Defendant replied that he did not have it. The officer then asked defendant where his driver's license was and defendant told Perry that he had lost it.

Defendant claims that this last statement was inadmissible because it was made in response to continued interrogation after he had requested the presence of an attorney. The State concedes that once an accused requests the presence of counsel, he may not be subjected to further interrogation by the police until counsel has been made available to him, unless the accused himself initiates further communication with the officers. *Edwards v. Arizona,* 451 U.S. 477, 68 L.Ed. 2d 378, 101 S.Ct. 1880 (1981). The State's argument here is that the statement complained of was made in response to questions posited to defendant during routine booking and thus did not constitute interrogation within the meaning of *Miranda.*

[4]  We have never considered the exact question here presented, that is, whether routine questions posited to a defendant during

booking constitute interrogation implicating the fifth amendment
protections enunciated in *Miranda.*

An overwhelming number of courts that have considered this
question have held that *Miranda* does not apply to the gathering
of biographical data necessary to complete booking. *See, e.g.,
United States ex rel. Hines v. LaVallee,* 521 F. 2d 1109 (2d Cir.
1975), *cert. denied,* 423 U.S. 1090, 47 L.Ed. 2d 101, 96 S.Ct. 884
(1976); *United States v. Prewitt,* 553 F. 2d 1082 (7th Cir.), *cert.
denied,* 434 U.S. 840, 54 L.Ed. 2d 104, 98 S.Ct. 135 (1977); *United
States v. LaMonica,* 472 F. 2d 580 (9th Cir. 1972); *State v. Cozad,*
113 Ariz. 437, 556 P. 2d 312 (1976) (en banc); *Pulliam v. State,* 264
Ind. 381, 345 N.E. 2d 229 (1976); *People v. Rivera,* 26 N.Y. 2d 304,
310 N.Y.S. 2d 287, 258 N.E. 2d 699 (1970); *State v. Rassmussen,* 92
Idaho 731, 449 P. 2d 837 (1969); *Clarke v. State,* 3 Md. App. 447,
240 A. 2d 291 (1968). *But see, Proctor v. United States,* 404 F. 2d
819 (D.C. Cir. 1968).

The Second Circuit offered the following explanation for its
decision that *Miranda* is inapplicable to routine informational
questions asked during the booking process:

> Despite the breadth of the language used in *Miranda,* the
> Supreme Court was concerned with protecting the suspect
> against interrogation of an investigative nature rather than
> the obtaining of basic identifying data required for booking
> and arraignment.

*United States ex rel. Hines v. LaVallee,* 521 F. 2d 1109, 1112-13
(2d Cir. 1975), *cert. denied,* 423 U.S. 1090, 47 L.Ed. 2d 101, 96 S.Ct.
884 (1976).

We agree with this analysis of the *Miranda* decision and
therefore hold that interrogation does not encompass routine in-
formational questions posited to a defendant during the booking
process. This result is consistent with the definition of interroga-
tion advanced by Justice Stewart in *Rhode Island v. Innis, supra.*
"[T]he term 'interrogation' under *Miranda* refers not only to ex-
press questioning, but also to any words or actions on the part of
the police (*other than those normally attendant to arrest and
custody*) that the police should know are reasonably likely to elicit
an incriminating response from the suspect." 446 U.S. at 301, 64
L.Ed. 2d at 308, 100 S.Ct. at 1689-90 (1980) (emphasis added).

We wish to emphasize, however, that we do not construe this limited exception to include any and all questions asked during the booking process. Such a rule would totally emasculate the *Miranda* protections and render meaningless the defendant's rights to remain silent and to have the presence of counsel. If all questions asked during booking were free from *Miranda* proscriptions, police officials could quiz the defendant about any subject so long as they timed their queries to coincide with the incidence of booking, regardless of whether the defendant had been given the *Miranda* warnings, whether he had invoked his right to remain silent or whether he had previously asked for an attorney. We therefore limit this exception to *routine informational* questions necessary to complete the booking process that are *not* "reasonably likely to elicit an incriminating response" from the accused.

[5] In this case, Agent Perry first asked defendant for his driver's license number. Perry testified that this was a routine question that was usually asked of all defendants at some point during the booking process. It is, of course, the question regarding the *location* of defendant's driver's license that is at issue here.

Under the facts presented, we agree with defendant that this question constituted interrogation under the *Innis* definition for it was "reasonably likely to elicit an incriminating response." Agent Foster knew precisely the location of defendant's driver's license for he himself participated in the discovery of the wallet and helped take photographs when and where it was discovered. As noted in *Innis*, the prior knowledge of the police and the intent of the officer in questioning the defendant is highly relevant to whether the police should have known a response would be incriminating. 446 U.S. at 301-02 n. 7, 64 L.Ed. 2d at 308 n. 7, 100 S.Ct. at 1690 n. 7. Since Agent Perry undoubtedly knew defendant's license was in police custody, the only logical reason for the question was the hope of eliciting an incriminating reply from defendant.

Although we agree with defendant that his response to Agent Perry's question should have been suppressed since it was the product of interrogation conducted after a request for counsel, we simply cannot agree with defendant's contention that

this error is sufficient to warrant a new trial. The jury was aware that a wallet containing defendant's driver's license and social security card had been found at the scene of the crime. Defendant's statement that he lost his driver's license does not, in our opinion, heighten the credibility or impact of this evidence to any significant degree. Certainly considering the overwhelming evidence presented implicating defendant, this rather innocuous statement that he had lost his driver's license could not possibly have affected the jury's verdict. The trial court's error in admitting this statement was clearly harmless beyond a reasonable doubt.

[6]   Finally, defendant contends that the procedure set forth in G.S. 15A-2000(a)(2) for death qualifying a jury prior to the guilt phase of a trial and permitting the same jury to hear both the guilt and penalty phases of a trial is unconstitutional. It is defendant's position that by death qualifying the jury and excusing for cause those who expressed opposition to the death penalty, he was denied a fair trial as guaranteed by the sixth and fourteenth amendments to the United States Constitution and article I, § 19 of the North Carolina Constitution. We have recently considered and rejected these contentions in *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981); and *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980). This assignment of error is without merit and is overruled.

Defendant received a full and fair trial and has had the benefit of adequate appellate advocacy before this Court. His trial was free of prejudicial error, and we find

No error.