State v. Hooper

---

STATE OF NORTH CAROLINA v. THOMAS M. HOOPER

No. 8529SC692

(Filed 4 February 1986)

1. **Searches and Seizures § 15— standing to object to search—insufficient showing**

    Defendant had no standing to object to the search of a truck he was driving when arrested and a duffel bag found therein where the truck was owned by a corporation and defendant presented no evidence showing any legitimate property interest in the truck, the duffel bag, or its contents.

2. **Criminal Law § 146.4— constitutional question—necessity for raising at trial court**

    A constitutional question which is not raised and passed upon by the trial court will not be considered on appeal.

3. **Homicide § 21.7— second degree murder—sufficiency of circumstantial evidence**

    The State's evidence was sufficient to support defendant's conviction of second degree murder where it tended to show that deceased lived with de-

fendant's estranged wife; defendant was embroiled in a custody dispute with his estranged wife which centered around a plan by the wife and deceased to take the children to another state; the murder weapon was found in the truck defendant was driving when arrested; defendant had particles of gunshot residue on the palm and back of one hand; defendant often drove a metallic gray Toyota Celica owned by a friend, and on the day of the shooting, witnesses saw a metallic gray compact car chasing deceased's truck upon a mountain road and later speeding down the same road; the driver of the gray car had a full beard, and defendant has a beard; defendant told an S.B.I. agent he had been "stalking" deceased for more than a month; and defendant told another S.B.I. agent that he appreciated the continued investigation by the S.B.I. even though the agents "had the motive, the gun, and the man."

**4. Criminal Law § 48.1— right to remain silent—evidence of assertion of constitutional rights**

The admission of an S.B.I. agent's testimony that, during the course of questioning, defendant "stopped right there and asserted his Constitutional right" violated defendant's constitutional right to remain silent and was prejudicial error in this second degree murder case.

Judge WEBB dissenting.

APPEAL by defendant from *Gudger, Judge.* Judgment entered 17 January 1985 in Superior Court, POLK County. Heard in the Court of Appeals 31 October 1985.

*Attorney General Lacy H. Thornburg by Associate Attorney General Sylvia Thibaut for the State.*

*Acting Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Geoffrey C. Mangum for defendant appellant.*

COZORT, Judge.

Defendant Thomas Hooper was tried upon an indictment, proper in form, for the murder of Todd Bradfield. He was convicted of second-degree murder and sentenced to fifteen years in prison. Defendant appeals from this conviction alleging that the trial court erred by denying his motion to suppress, by denying his motion to dismiss because of insufficient evidence, and by allowing testimony of an S.B.I. agent that at a crucial stage during questioning the defendant asserted his constitutional right to remain silent. We grant a new trial based on the erroneous admission of the S.B.I. agent's testimony.

The State's evidence tended to show the following:

On 28 July 1983, at approximately 10:00 a.m. Todd Bradfield was found fatally wounded inside his truck on Hogback Mountain Road in Polk County, North Carolina. Mr. Bradfield died several days later without ever regaining consciousness.

Prior to 28 July 1983, the deceased lived with the defendant's estranged wife, Sarah Hooper, in Travelers Rest, South Carolina. The three Hooper children also lived with Ms. Hooper in Travelers Rest. The deceased and Ms. Hooper planned to move with the Hooper children in the fall of 1983 to a house being built on Hogback Mountain in Polk County, North Carolina. The defendant, who lived in Greenville, South Carolina, with his friend, C. J. Peterson, Jr., opposed such a move because it meant that the children would be moving out of state. A custody dispute between Ms. Hooper and the defendant ensued and a hearing was scheduled for early August of 1983 to determine whether the children would start school in North Carolina or South Carolina.

In order to establish his right to custody of the three Hooper children, upon the advice of his attorney, the defendant conducted "surveillance" of the Hooper home in Travelers Rest to find out if the deceased was living with Ms. Hooper. Defendant, along with several of his friends, took over two hundred photographs of the deceased and Ms. Hooper, including photographs of the deceased and Ms. Hooper making love.

On 28 July 1983, Amelia Medford, who lived on Hogback Mountain Road, was working in her yard when she heard what sounded like a car backfiring several times, followed by the sound of a car crash. As Mrs. Medford walked down Hogback Mountain Road toward the sound, she observed a gray compact car traveling down Hogback Mountain Road "at quite a clip." Mrs. Medford could not give any specifics about the model or make of the car. After walking down the road Mrs. Medford observed a tan and brown pickup truck with its front end off the road and its motor running. Mrs. Medford and a friend called the police from a neighbor's house on Hogback Mountain.

Jerry Ross, Chief of the Tryon City Police Department, and Officer Richard Foley were the first to arrive at the crime scene. Chief Ross inspected the truck and noticed a bullet hole in the

passenger's door. He found four spent .45 caliber cartridges and some ammunition on the floorboard and a bullet on the side of the roadway. All this evidence was turned over to the North Carolina S.B.I.

Wallace Crawford testified that about 10:00 a.m. on 28 July 1983, he left his house and traveled down Hogback Mountain Road toward Tryon, North Carolina. When he was about a mile and a half down from the Medford house, he saw a light tan pickup truck with a "cap" on it traveling up Hogback Mountain and a metallic blue or gray small sports car chasing the pickup. Mr. Crawford described the driver of the car as a man with a full whiskered face with gray streaks and fluffy dark hair. Mr. Crawford could not describe the driver of the truck. Mr. Crawford described what he saw to S.B.I. Agent Ned Whitmire who was at the crime scene when Crawford came back from Tryon. At trial, Mr. Crawford was unable to positively identify the defendant as the man he had seen in the car on the day of the shooting.

S.B.I. Agent Whitmire testified that he was familiar with the defendant and the deceased because he had investigated another matter involving both men. Agent Whitmire knew that a conflict existed between defendant and Bradfield. Agent Whitmire surmised from Mr. Crawford's description of the driver of the car that it was probably defendant.

Agent Whitmire contacted Officer Danny Clyde of the Greenville Police Department and informed Officer Clyde that there had been a shooting in North Carolina, that the defendant was the suspect, and that Agent Whitmire would be in Greenville shortly with a warrant for defendant's arrest on a charge of assault with a deadly weapon. Agent Whitmire told Officer Clyde of the defendant's address in Greenville and asked Officer Clyde to arrest defendant on a fugitive warrant. The defendant was driving a 1971 GMC Sprint truck in Greenville when he was stopped by Investigator Helton of the Greenville Sheriff's Department and informed that an investigation was being conducted by authorities in North Carolina and that a fugitive from justice warrant was being sought against him. Defendant voluntarily went with the investigator to the Greenville Law Enforcement Center.

The defendant was served with a fugitive from justice arrest warrant in the afternoon of 28 July 1983. A court order was obtained which allowed an atomic absorption test for the presence of gunshot residue to be performed on defendant. The defendant was questioned by Agent Steve Reed of the North Carolina S.B.I. concerning his surveillance of the Hooper residence in Travelers Rest and his activities that day. Agent Reed testified that the defendant told him that he had been working surveillance on the deceased because the deceased had moved in with defendant's wife. Agent Reed also testified that defendant told him that he had been "stalking" Todd Bradfield since the middle of June. Agent Reed further testified that after answering a series of questions "[defendant] stopped right there and asserted his Constitutional rights."

A search warrant was obtained to search the truck that defendant was driving when he was stopped. The truck was owned by P. I. Inc., not defendant. Pursuant to the search warrant, the officers seized from the truck a green duffel bag, a Colt .45 caliber automatic gun, a dark wig, a box containing 39 rounds of .45 caliber ammunition, a .30 caliber carbine with a loaded clip, an address book, and two checkbooks. The .45 caliber gun was sent to the S.B.I. for identification and testing.

Agent Steve Carpenter of the S.B.I., an expert in firearm identification, testified that a portion of a bullet jacket obtained from the deceased's skull was fired from the .45 caliber gun seized from the truck. Carpenter also testified that the spent shells found at the crime scene were fired from the same gun and that bullets found at the crime scene had also been fired from the gun. In addition Carpenter testified that the cartridges found in the truck were the same type of cartridges found at the crime scene.

Finally, Agent Whitmire testified at trial that while defendant was out on bond, Whitmire met defendant in Greenville and defendant told Whitmire he appreciated the S.B.I.'s ongoing investigative efforts, even though "[the agents] had the motive, the gun [and] the man."

The defendant's evidence tended to show the following:

On the day of the shooting Mrs. Sylvia Epps, a neighbor of defendant's wife, testified that she saw the defendant crossing a

neighbor's yard around 9:45 a.m. Mrs. Mildred Davis testified that she was having her hair done at Mrs. Epps' house about 9:45 in the morning on the day of the shooting and Mrs. Epps commented that Tom Hooper was crossing the neighbor's yard. Another witness, Phillip Hinsdale, testified that he called defendant at the home of C. J. Peterson, Jr., in Greenville, South Carolina, on the morning of July 28 within five minutes one way or the other of 10:30. Several witnesses testified that defendant had a good reputation in the community.

The defendant brings forth three assignments of error on appeal: (1) the trial court erred in denying defendant's motion to dismiss based on the sufficiency of the evidence; (2) the trial court erred by allowing S.B.I. Agent Steve Reed to testify that defendant gave several statements and then "stopped right there and asserted his Constitutional rights"; and (3) the trial court erred by denying defendant's motion to suppress evidence based on an invalid arrest.

[1] First we address the defendant's contention that the trial court erred by denying the defendant's motion to suppress. The only evidence seized by the police was seized from a search of the truck defendant was driving when he was stopped by the police. The State argues that the defendant did not have standing to oppose the search of the truck because there is no evidence the defendant either owned, leased, or had permission to use the truck.

To have standing the defendant must have a legitimate expectation of privacy in the thing to be searched. *Rakas v. Illinois*, 439 U.S. 128, 58 L.Ed. 2d 387, 99 S.Ct. 421 (1978); *State v. Thompson*, 73 N.C. App. 60, 325 S.E. 2d 646 (1985). The defendant has the burden of showing this expectation. *Rawling v. Kentucky*, 448 U.S. 98, 104, 65 L.Ed. 2d 633, 641, 100 S.Ct. 2556, 2561 (1980); *State v. Jones*, 299 N.C. 298, 261 S.E. 2d 860 (1980); *State v. Taylor*, 298 N.C. 405, 259 S.E. 2d 502 (1979). Defendant presented no evidence showing any legitimate property interest in the truck, the green duffel bag, or its contents. Neither defendant nor the owner of the truck, testified at the suppression hearing. Defendant has failed to show that he had any expectation of privacy in the things to be searched. Therefore, defendant lacks standing to object to the search in this case.

[2] On appeal, the defendant further argues that evidence of defendant's statements and evidence seized after his arrest should not have been admitted at trial because no probable cause existed for his arrest. Defendant presented no such argument to the trial court. It is well established that the theory upon which a case is tried in lower court must control in construing the case on appeal. A constitutional question which is not raised and passed upon by the trial court will not be considered on appeal. *State v. Cooke*, 306 N.C. 132, 291 S.E. 2d 618 (1982).

[3] We now address defendant's contention that the evidence was insufficient to show that the defendant was the person who killed Todd Bradfield. Upon a motion to dismiss in a criminal action, "all of the evidence favorable to the State, whether competent or incompetent, must be considered, such evidence must be deemed true and considered in the light most favorable to the State, discrepancies and contradictions therein are disregarded and the State is entitled to every inference of fact which may be reasonably deduced therefrom." *State v. Witherspoon*, 293 N.C. 321, 326, 237 S.E. 2d 822, 826 (1977). In a homicide case there must be substantial evidence from which a jury might reasonably infer: (1) that the deceased died as a result of a criminal act; and (2) that the act was committed by the defendant. *State v. Lee*, 294 N.C. 299, 302, 240 S.E. 2d 449, 451 (1978). The State has presented sufficient evidence to meet both requirements.

The evidence favoring the State is primarily circumstantial. However, there is a substantial amount of circumstantial evidence from which a jury could reasonably infer that defendant had the motive, opportunity, and means to shoot Bradfield. The evidence of motive showed that defendant had watched the deceased for almost one and one-half months, taking pictures of deceased and his estranged wife in all aspects of their relationship. Defendant was embroiled in a custody dispute with his estranged wife which centered around Ms. Hooper's and the deceased's taking the children to another state. There was substantial evidence from which the jury could infer that defendant had a reason to kill Bradfield.

There was evidence from which it could be inferred that the defendant had the means to commit the homicide. The murder weapon was found in the truck defendant was driving when he

was stopped by the police. A jury might reasonably infer that this gun did in fact belong to defendant. Further evidence indicated that defendant had particles of gunshot residue on both the palm and back of his hand which indicated that defendant could have fired a gun.

The State presented evidence from which it could be reasonably inferred that defendant had the opportunity to commit the crime. Defendant had observed the habits of the deceased for about one and one-half months. Ms. Hooper testified that defendant often drove a gray metallic Toyota Celica which belonged to his friend, C. J. Peterson, Jr. Witnesses described a gray metallic compact car chasing the deceased's truck up Hogback Mountain Road on the day of the shooting and speeding down the same road after the sound of a car crash was heard. One witness, who could not positively identify defendant as the driver of the car, described the driver of the gray metallic car as a light-complected man in his mid-30's to 40's with a full beard and dark fluffy hair. The defendant had a beard and was in his early 40's.

Statements made by the defendant to law enforcement officers implied that he was the one who shot the deceased. The defendant told S.B.I. Agent Steve Reed that he had been "stalking" the deceased since the middle of June. Defendant told S.B.I. Agent Ned Whitmire that he appreciated their continued investigation even though "[the agents] had the motive, the gun, [and] the man." From the substantial evidence presented by the State, a jury could reasonably infer that the defendant had the motive, means, opportunity, and actually did commit the crime.

The defendant cites the cases of State v. Jones, 280 N.C. 60, 184 S.E. 2d 862 (1971), and State v. Lee, 294 N.C. 299, 240 S.E. 2d 449 (1978), for the proposition that there is insufficient evidence to convict him. These cases are distinguishable. In Jones the husband was tried for the murder of his wife. The evidence tended to show the husband was extremely intoxicated on the night of his wife's murder, there had been an angry exchange between the husband and wife, and the husband was carrying a .22 caliber pistol and had bloodstains on his jacket when arrested. Jones, supra, at 61-65, 184 S.E. 2d at 862-65. In that case, unlike this case, the murder weapon was not produced, and defendant made no out-of-court statements which would tend to incriminate him.

In *Lee* the defendant was charged with the murder of his girl friend. The evidence showed that the girl friend was killed with a .25 caliber gun and that defendant had access to a .25 caliber gun but that others in his family also had access to the gun. *Lee, supra,* at 301, 240 S.E. 2d at 450. The two lead fragments taken from the girl friend's body could not be used for identifying the weapon from which they may have been fired; and, therefore, the murder weapon was not positively identified. The Supreme Court found that even though sufficient evidence existed to show opportunity, means, and perhaps the mental state, the State's case must fail because there was not substantial evidence offered to show that defendant actually committed the murder. *Id.* at 303, 240 S.E. 2d at 451. The facts of this case show that the murder weapon was found shortly after the murder in the truck which defendant was driving, and that defendant made an incriminating statement to an S.B.I. agent from which it could be inferred that he actually committed the murder. This assignment of error is overruled.

[4] Next we address defendant's contention that the trial court erred by allowing S.B.I. Agent Steve Reed to testify, over objection, that defendant in the course of questioning "stopped right there and asserted his Constitutional rights." It is well established that the State may not introduce evidence that a defendant exercised his Fifth Amendment right to remain silent. *State v. Ladd,* 308 N.C. 272, 283-84, 302 S.E. 2d 164, 171-72 (1983). The words the defendant uses to invoke his constitutional rights are not to be introduced at the trial. *Id.* A defendant must be allowed to invoke his constitutional right to remain silent without fear that he will be penalized for having done so. *Id.; Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). As noted by the North Carolina Supreme Court in *Ladd,* "[t]he value of constitutional privileges is largely destroyed if persons can be penalized for relying on them." *Id.* at 284, 302 S.E. 2d at 172, *quoting Grunewald v. United States,* 353 U.S. 391, 425, 1 L.Ed 2d 931, 955, 77 S.Ct. 963, 984-85 (1956) (Black, J., concurring).

The text of S.B.I. Agent Reed's testimony reveals the prejudicial nature of his statement:

Q. Mr. Reed, will you tell us, please, what statement Mr. Hooper made to you there on the date that you questioned him, that would be July the 28th of '83?

A. Mr. Hooper stated that he had been working surveillance on Mr. Bradfield because Bradfield had moved in with his wife, Sarah Hooper. He said that he had in his possession over two hundred photographs of Mr. Bradfield and Sarah Hooper and that he and some of his friends had made these photographs. He said that one of the friends that had helped him make these photographs was Ed Penry, and he described Ed Penry as an expert photographer. He further said that, on occasions, his roommate, Pete Peterson, had helped him with the surveillance and that he said that Mr. Peterson "was with me this morning," and then *stopped right there and asserted his Constitutional rights* at that point. [Emphasis added.]

Taken in full context the testimony shows that when the defendant reached a crucial place in his statement to the police, he then invoked his constitutional right to silence. The actual words the defendant used to invoke his constitutional rights were, "Well, I better stop right there." The agent's artful paraphrasing of the defendant's assertion was more harmful than what the defendant actually said. The introduction of Agent Reed's statement violated the defendant's constitutional right to remain silent as guaranteed by the Fifth and Fourteenth Amendments.

Because the statement was introduced in violation of the defendant's constitutional rights, he is entitled to a new trial unless we determine that the erroneous admission of Agent Reed's statement was harmless beyond a reasonable doubt. G.S. 15A-1443(b); *Ladd, supra,* at 284, 302 S.E. 2d at 172. There must be no reasonable possibility that the admission of the erroneous statement contributed to the conviction. The burden is on the State to show that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967). However, "[o]verwhelming evidence of guilt may render constitutional error harmless." *State v. Brown,* 306 N.C. 151, 164, 293 S.E. 2d 569, 578, *cert. denied,* 459 U.S. 1080, 74 L.Ed. 2d 642, 1103 S.Ct. 503 (1982).

The evidence presented in this case, although sufficient to withstand a motion for nonsuit, is not overwhelming. We cannot say that there is no reasonable possibility that the admission of

the agent's statement might have contributed to the defendant's conviction. The admission of the agent's description of the defendant's exercise of his right to remain silent, taken in the context of the agent's testimony, was prejudicial error.

New trial.

Judge BECTON concurs.

Judge WEBB dissents.

Judge WEBB dissenting.

I dissent. I do not believe the statement by Mr. Reed that the defendant stopped talking to him and asserted his constitutional rights is prejudicial error. This is not a case in which the defendant remained silent and this was used against him. Mr. Reed properly testified as to what the defendant told him. I do not see how it is more harmful to the defendant for Mr. Reed to have testified as he did rather than merely to have said the defendant stopped talking to him, which in the majority view would not have constituted prejudicial error.