McGEE, Chief Judge.
 

 *201
 
 Herbert Lee Stroud ("Defendant") appeals from judgments entered after a jury found him guilty of first-degree felony murder, larceny, robbery with a dangerous weapon, and possession of stolen goods.
 

 I.
 
 Background
 

 The body of Henry Lionel Bouyer, Jr. ("Bouyer") was discovered in a shallow ditch on the side of Carrolls Road in Warsaw, North Carolina, in the early morning hours of 21 August 2012. Dr. Anuradha Arcot ("Dr. Arcot"), the forensic pathologist who performed the autopsy, testified Bouyer died from three shots fired from a shotgun at close range-one to his neck, a second to his back, and a third near his groin. Dr. Arcot was unable to determine a specific time of death, and could only say that Bouyer died sometime within the twenty-four hours prior to the discovery of his body. The State presented a timeline of the events surrounding Bouyer's death.
 

 *202
 
 A few days prior to the discovery of Bouyer's body, Defendant and his stepson, Jeremy Stephens ("Stephens"), visited the home of Travis Jones ("Jones"), a mechanic. Defendant and Stephens asked Jones what alterations he could make to the appearance of a motorcycle. Jones replied that if he was provided the necessary parts and was paid for his labor, he could make any modifications they desired. Defendant and Stephens did not have a motorcycle with them on that day.
 

 Around 6:00 p.m. on 20 August 2012, Bouyer drove his motorcycle to a BP station in Warsaw to buy a lottery ticket. Bouyer's motorcycle, a Suzuki GSXR 1000, was a distinctive black and yellow color with a Joker emblem painted on its side. From the BP station, Bouyer drove to a barbershop for a haircut, arriving around 6:45 p.m. While receiving his haircut, Bouyer made and received between five and ten phone calls, annoying his barber and friend, Martin Batts ("Batts"). Bouyer paid Batts with cash from his wallet, and left on his motorcycle between 7:15 p.m. and 7:30 p.m.
 

 Bouyer was next seen at the Small Towns Convenience Mart ("Small Towns") in nearby Magnolia, North Carolina. Ivey Chestnutt ("Chestnutt"), a clerk at Small Towns, saw Bouyer enter the store around 7:30 p.m. Chestnutt and Bouyer began a conversation, during which Bouyer received a number of phone calls. After finishing one of his phone calls, Bouyer told Chestnutt he had "a guy that wants to buy my motorcycle." Bouyer explained that he "ran it out to him for a couple days, and right now he wants to keep bugging me, wanting [me] to rent the motorcycle out to him or wanting to buy it." Bouyer added that if the unnamed person would pay him $5,000.00, he would sell that person the motorcycle. Bouyer received one more phone call, said goodbye to Chestnutt, and left.
 

 Bouyer rode his motorcycle back to the BP station in Warsaw to meet with Defendant and Stephens. Dedra McGowan ("McGowan"), a clerk at the BP station, saw Bouyer enter the BP station first, followed by the Defendant shortly thereafter. After speaking inside the BP station for only a moment, Bouyer and Defendant left the station and continued talking in the parking lot with Bouyer sitting on his motorcycle, and Defendant and Stephens sitting in Defendant's Jeep Cherokee ("the Jeep"). McGowan testified that the three "looked comfortable," and "looked like they knew each other already." Surveillance footage from the BP station confirmed McGowan's testimony, showing Bouyer and Defendant inside the BP station for a short period of time, and also Bouyer, Defendant, and Stephens talking in the parking lot for about four minutes. Following this conversation, Defendant and Stephens
 
 *203
 
 left the parking lot at 8:59 p.m. in Defendant's Jeep, and Bouyer headed in the same direction on
 
 *38
 
 his motorcycle seventeen seconds later. No testimony presented at trial tended to show Bouyer's whereabouts after 8:59 p.m. on 20 August 2012.
 

 That same night, Defendant visited the home of his friend, Ellie Graham ("Graham"), in Rose Hill, North Carolina. Graham initially testified that "it was a little after 9:00 [p.m.] when [Defendant] came to my house[,]" but later testified that Defendant arrived "somewhere between 9:00 [p.m.] and 11:00 [p.m.]" Graham testified that during a thirty minute visit, Defendant "wasn't himself that day" because he was crying, and was generally distraught about marital problems he was having with his wife. Graham testified that other than Defendant having red eyes associated with crying, he did not notice anything different about Defendant's physical appearance. Graham testified that Defendant was alone, and that Defendant stated he needed to borrow some money so he could pick Stephens up from work that night.
 

 The following day, Defendant and Stephens returned to Jones' house around 4:00 p.m. with a motorcycle, later identified as Bouyer's. Defendant and Stephens told Jones they would like the motorcycle to be stretched out and lowered, and would like a mural to be painted on its side. Jones told them that he could not start work on the motorcycle until they either purchased the required parts or paid him so he could order the parts himself. Defendant and Stephens did not have any money with them at the time, so the motorcycle was parked in a field adjacent to Jones' house.
 

 A few days later, Defendant and Stephens returned to Jones' house to ask whether he could sell the bike or otherwise "get rid of it for them." Jones responded that he would be unable to find a buyer without the proper paperwork, but if he was provided with the title to the motorcycle, he would attempt to find a buyer. During that visit, Jones asked Defendant and Stephens whether they "finally [got their] money problem straightened out." Jones testified that Defendant responded "that any problem that they had, any money-any problem that they had had been taken care of, and then [Defendant] looked at [Stephens], and [Stephens] smiled, and that was the end of that conversation."
 

 A.
 
 Law Enforcement Investigation
 

 Bouyer's body was discovered the morning of 21 August 2012 around 7:30 a.m. Among the evidence collected at the scene by law enforcement was: a motorcycle helmet, later identified as Bouyer's; a broken cell phone; a pear; and a spent 9-millimeter shell casing, found
 
 *204
 
 one hundred yards from the body. Deputy George Garner ("Deputy Garner"), of the Duplin County Sheriff's Office, was asked to assist in identifying the phone number for the phone that was found at the scene. After identifying the phone number, a subpoena was issued for the subscriber information on the number, which in turn allowed Deputy Garner to determine that the phone belonged to Bouyer. The Duplin County Sheriff's Office also requested and received cell phone records of Defendant and Stephens, among others.
 

 Records from the cell phones of Defendant, Stephens, and Bouyer provided information regarding phone calls and text messages between Stephens and Bouyer, and the relative locations of the three phones on the night of 20 August 2012. First, the call detail records from the phones of Bouyer, Stephens, and Defendant confirmed that many of the phone calls Bouyer placed and received on 20 August 2012 were to and from the cell phone number identified as belonging to Stephens. That day, Bouyer called Stephens four times, and Stephens called Bouyer eleven times. The call detail records show that Defendant's phone was never used to call, and did not receive a call from, Bouyer's phone on 20 August 2012.
 

 Next, the text detail records show multiple text messages between Stephens and Bouyer regarding, presumably, the purchase of Bouyer's motorcycle. Stephens texted Bouyer at 7:29 p.m. on 20 August 2012 that they would "[m]eet ... at Small Towns," and two minutes later, texted Bouyer that "[w]e are buying it today, ill [sic] let u [sic] use my card [sic] to get back tour [sic] crib." The call detail records also show that Defendant's phone was never used to send a message to, nor did it ever receive a message from, Bouyer's phone.
 

 *39
 
 Finally, the call detail records, through the use of historical cell site analysis, also provided some evidence of the relative location of the phones of Bouyer, Defendant, and Stephens on the night of 20 August 2012. At trial, Agent William Williams ("Agent Williams"), of the Federal Bureau of Investigation, testified that the last two phone calls made to Bouyer's phone that resulted in location data being collected were made at 8:20 p.m. and 8:36 p.m. on 20 August 2012. When those calls were received, Bouyer's cell phone utilized a specific cell tower and sector: tower 4c4, sector 2. Agent Williams testified that both the BP station and Bouyer's residence were within the "footprint" of tower 4c4, sector 2, meaning calls made from those locations would likely be routed through that tower and sector. Regarding Stephens' phone, Agent Williams testified that at 8:36 p.m. and 8:39 p.m. on 20 August 2012, Stephens' phone utilized that same tower and sector, which indicated that his phone and
 
 *205
 
 Bouyer's phone "would have been within the footprint of this particular tower," meaning that they "were relatively close together." Stephens' phone then utilized the same tower, but a different sector, sector 3, five times on 20 August 2012, at 9:15 p.m., 9:17 p.m., 9:19 p.m., 9:20 p.m., and 9:55 p.m. According to Agent Williams, tower 4c4, sector 3 was significant because it was the sector in which Bouyer's body was discovered the next morning.
 

 Regarding Defendant's phone, Agent Williams testified that it utilized tower 4c4, sector 1 four times between 9:39 p.m. and 9:48 p.m. Three of those calls-at 9:43 p.m., 9:45 p.m., and 9:48 p.m.-were between Stephens' and Defendant's phones. Agent Williams explained that tower 4c4, sector 1, "points" to the northeast, towards Warsaw. Defendant's phone then utilized a different tower, tower 4bf, sector 1, near Rose Hill, at 11:04 p.m. Though Defendant's phone made and received a total of eighty-nine calls on 20 August 2012, it never utilized tower 4c4, sector 3 on that date.
 

 Lieutenant Michael Stevens ("Lt. Stevens"), an investigator with the Duplin County Sheriff's Office, retrieved the security footage from the BP station. Lt. Stevens, who was a friend of Bouyer, knew Bouyer worked as a truck driver and would often park his truck in the BP station parking lot when it was not in use. While at the BP station retrieving the surveillance footage, Lt. Stevens noticed Bouyer's truck in the parking lot. In searching the truck, the title to Bouyer's Suzuki motorcycle was located.
 

 After reviewing the call detail records and viewing the BP surveillance footage, law enforcement deemed Stephens a suspect and began surveillance of him on 24 August 2012. During the surveillance, officers observed Stephens leave the Subway restaurant in Rose Hill, North Carolina where he worked, in Defendant's Jeep. Following him from the Subway, officers observed Defendant and Stephens make stops at several locations, and eventually followed the pair to Jones' residence. As a result of the surveillance, law enforcement seized Bouyer's motorcycle from the field adjacent to Jones' residence.
 

 Law enforcement obtained a warrant to search Defendant's Jeep on 28 August 2012. From the Jeep, law enforcement retrieved a wallet, found underneath the center console of the vehicle. The wallet contained Bouyer's North Carolina registration card identifying him as the owner of a Suzuki motorcycle. Subsequent forensic testing revealed Defendant's DNA on the wallet. Law enforcement also found a bag containing a pear in the back cargo area of the Jeep.
 

 *206
 
 The same day, law enforcement also obtained and executed a search warrant on Defendant's home, where both he and Stephens lived. In Stephens' bedroom, law enforcement recovered a motorcycle helmet, in which subsequent testing revealed the presence of Stephens' DNA, but not Defendant's or Bouyer's. At the time the search was executed, Defendant's bedroom door was locked and had to be forced open. In Defendant's bedroom, law enforcement discovered a Lorcin 9-millimeter handgun hidden inside the frame of an electric heater, along with a box of 9-millimeter bullets. A credit card belonging to Stephens was found in Defendant's closet, indicating that both Defendant and Stephens "seemed to occupy that residence" and had regular access to the entire house. Subsequent forensics testing confirmed
 
 *40
 
 that the 9-millimeter shell casing found one hundred yards from Bouyer's body had been fired from the 9-millimeter handgun found hidden in Defendant's bedroom. Police also found shotgun shell wadding in the backyard of the residence, and a pear tree in the backyard of the adjoining residence. No shotgun was recovered from Defendant's and Stephens' residence.
 

 Items seized from both Defendant's car and home, including a pair of Stephen's shoes; a pair of Defendant's shoes; a pair of Defendant's pants; the front and rear floor mats from Defendant's Jeep; the rear cargo floor lining from Defendant's Jeep; a pair of gloves; and a black trash bag, among others, were sent to the North Carolina State Crime Lab for testing. None of the items seized from Defendant or Stephens tested positive for the presence of blood. Based on the evidence collected throughout the investigation, a warrant for Defendant's arrest was issued 7 September 2012.
 

 B.
 
 Indictment and Trial
 

 Defendant was indicted by a grand jury on 6 October 2014, and his trial began on 20 April 2015. At trial, the State presented the testimony of thirty-seven witnesses over a span of six days. At the conclusion of the State's case, Defendant's counsel made the following motion:
 

 [Defendant's Counsel]: If Your Honor please, the defendant would-as to Count 1 of the indictment charging murder by premeditation and deliberation, we would ask for a directed verdict. We would acknowledge that there's enough to go to the jury on the felony murder, but I do not-no premeditation or deliberation would be supported.
 

 After hearing from the State, Defendant's counsel clarified that the motion for a directed verdict included counts two-four of the indictment, on
 
 *207
 
 the charges of felony larceny, robbery with a dangerous weapon, and possession of stolen goods. The trial court denied Defendant's motion.
 

 The jury returned a verdict on 1 May 2015 finding Defendant guilty of first-degree murder in the perpetration of a felony only; it specifically declined to find Defendant guilty of first-degree murder on a theory of premeditation and deliberation. The jury also convicted Defendant of felony larceny, robbery with a dangerous weapon, and possession of stolen goods. After the verdict was announced, Defendant moved "to set aside the verdict for lack of evidence and for legal errors." The trial court denied Defendant's motion. The trial court then entered judgments in accordance with the jury's verdict, and sentenced Defendant to life imprisonment without the possibility of parole on the charge of first-degree murder, and to a concurrent term of imprisonment between sixty-four and eighty-nine months for the other three convictions. Defendant appeals.
 

 II.
 
 Analysis
 

 Defendant contends the trial court erred by denying his motion to dismiss and failing to arrest judgment on the three felonies underlying his conviction for felony first-degree murder. He also contends the trial court plainly erred by allowing the introduction of testimony regarding his attempts to hire an attorney.
 

 A.
 
 Denial of Defendant's Motion to Dismiss
 

 Defendant argues the trial court erred in failing to dismiss for insufficient evidence the charges of robbery with a dangerous weapon, larceny, and first-degree murder. As a preliminary matter, we must determine whether this argument has been properly preserved for our review. As noted, Defendant moved for directed verdict on the charge of first-degree murder under a theory of premeditation and deliberation at the close of State's evidence, but conceded at that time "that there's enough to go to the jury on the felony murder." Before the trial court ruled on the directed verdict motion, Defendant clarified that the motion was also made as to counts two-four of the indictment, those being the charges of larceny, robbery with a dangerous weapon, and possession of stolen goods. After the motion was denied and the jury returned its verdicts, Defendant then made a separate motion "to set aside the verdict for lack of evidence and for legal errors," which was also denied.
 

 In
 
 State v. Mercer
 
 ,
 
 317 N.C. 87
 
 ,
 
 343 S.E.2d 885
 
 (1986), our Supreme Court explained that
 
 *41
 
 a defendant's motion "to set aside the verdict as being against the weight of the evidence" is "properly denominated a
 
 *208
 
 motion for dismissal for insufficiency of the evidence to sustain a conviction ... after return of a verdict of guilty and before entry of judgment, [N.C. Gen. Stat.] § 15A-1227(a)(3)."
 
 Mercer
 
 ,
 
 317 N.C. at 99-100
 
 ,
 
 343 S.E.2d at 893
 
 (citation and quotation marks omitted, alteration in original). Given that Defendant's motion in the present case was nearly identical to that made by the
 
 Mercer
 
 defendant, we likewise treat Defendant's motion as a motion to dismiss pursuant to N.C.G.S. § 15A-1227(a)(3).
 

 Id.
 

 N.C.G.S. § 15A-1227(a)(3) provides in relevant part: "A motion for dismissal for insufficiency of the evidence to sustain a conviction may be made ... [a]fter return of a verdict of guilty and before entry of judgment." N.C. Gen. Stat. § 15A-1227(a)(3) (2015). The statute also specifically provides that a "[f]ailure to make the motion at the close of the State's evidence or after all the evidence is not a bar to making the motion at a later time," and that "[t]he sufficiency of all evidence introduced in a criminal case is reviewable on appeal without regard to whether a motion has been made during trial[.]" N.C. Gen. Stat. §§ 15A-1227(b), (d) (2015). Notwithstanding Defendant's anomalous concession that the evidence presented by the State was sufficient to withstand a motion for a directed verdict as to the charge of first-degree murder in the perpetration of a felony, we are satisfied that Defendant's latter motion, standing alone, was sufficient to properly preserve this issue for our review. In accord with precedent, we interpret that motion, styled by Defendant's counsel as a motion "to set aside the verdict for lack of evidence and for legal errors," as a motion to dismiss pursuant to N.C. Gen. Stat. § 15A-1227(a)(3). Because Defendant's § 15A-1227(a)(3) motion was made as to all of the convictions against him-including his conviction for first-degree felony murder-we conclude that Defendant properly moved to dismiss each of the charges against him, and consider the merits of Defendant's argument.
 

 This Court reviews a trial court's denial of a motion to dismiss
 
 de novo
 
 .
 
 State v. Smith
 
 ,
 
 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007) (citing
 
 State v. McKinnon
 
 ,
 
 306 N.C. 288
 
 , 298,
 
 293 S.E.2d 118
 
 , 125 (1982) ). Our review of a trial court's ruling on a motion to dismiss is the same regardless of when the motion was made.
 
 State v. Scott
 
 ,
 
 356 N.C. 591
 
 , 595,
 
 573 S.E.2d 866
 
 , 868 (2002). In ruling on a motion to dismiss, "the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator. Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion."
 
 State v. Winkler
 
 ,
 
 368 N.C. 572
 
 , 574,
 
 780 S.E.2d 824
 
 , 826 (2015) (citation and quotation marks omitted). "The terms 'more than a scintilla of evidence'
 

 *209
 
 and 'substantial evidence' are in reality the same and simply mean that the evidence must be existing and real, not just seeming or imaginary."
 
 State v. Earnhardt
 
 ,
 
 307 N.C. 62
 
 , 66,
 
 296 S.E.2d 649
 
 , 652 (1982) (citation omitted). In reviewing the trial court's ruling, we must evaluate the evidence in the light most favorable to the State, and all contradictions in the evidence must be resolved in its favor.
 
 State v. Malloy
 
 ,
 
 309 N.C. 176
 
 , 179,
 
 305 S.E.2d 718
 
 , 720 (1983). The State
 

 is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion.
 

 Winkler
 
 ,
 
 368 N.C. at 574
 
 ,
 
 780 S.E.2d at 826
 
 (citation omitted).
 

 "If the trial court finds substantial evidence, whether direct or circumstantial, or a combination, to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied."
 

 Id.
 

 (citation omitted). "Ultimately, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances."
 
 State v. Lee
 
 ,
 
 348 N.C. 474
 
 , 488,
 
 501 S.E.2d 334
 
 , 343 (1998) (citation omitted). If, however, the evidence
 
 *42
 
 presented at trial is "sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed."
 
 State v. Golphin
 
 ,
 
 352 N.C. 364
 
 , 458,
 
 533 S.E.2d 168
 
 , 229-30 (2000) (citation omitted).
 

 Felony murder is defined in
 
 N.C. Gen. Stat. § 14-17
 
 as: "A murder which ... shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree[.]"
 
 N.C. Gen. Stat. § 14-17
 
 (a) (2015). "[T]he elements necessary to prove felony murder are that [1] the killing took place [2] while the accused was perpetrating or attempting to perpetrate one of the enumerated felonies [in N.C.G.S. § 14-17 ]."
 
 State v. Bunch
 
 ,
 
 363 N.C. 841
 
 , 846-47,
 
 689 S.E.2d 866
 
 , 870 (2010) (quotation omitted). When the jury returned its verdict finding Defendant guilty of first-degree felony murder, it indicated that the felonies underlying the murder conviction were larceny, robbery with a dangerous weapon, and possession of stolen goods. As Defendant only
 
 *210
 
 argues that the State failed to present "substantial evidence" that he was the perpetrator of larceny and robbery with a dangerous weapon, we only address those two crimes.
 
 [1]
 

 Defendant was convicted of felony larceny, pursuant to
 
 N.C. Gen. Stat. § 14-72
 
 (a), and robbery with a dangerous weapon, pursuant to
 
 N.C. Gen. Stat. § 14-87
 
 . Defendant does not argue that the State failed to present substantial evidence that larceny and robbery with a dangerous weapon occurred; rather, the gravamen of Defendant's argument is that the State failed to provide substantial evidence that Defendant was the perpetrator of those two offenses. We disagree.
 

 The State presented evidence tending to show that, in the days prior to 20 August 2012, Defendant and Stephens visited Jones' residence and were interested in changing the appearance of a motorcycle, though they did not have a motorcycle with them at the time. Through a multitude of witnesses, the State then presented a timeline of Defendant's, Stephens', and Bouyer's movements on the evening of 20 August 2012 from roughly 6:00 p.m. until 8:59 p.m. At 8:59 p.m., Bouyer departed a meeting with Defendant and Stephens that occurred in the parking lot of the BP station, and all three men were seen heading off in the same direction. Defendant and Stephens were the last to see Bouyer until his body was discovered early the next morning. In the days following the discovery of Bouyer's body, Defendant and Stephens were in possession of Bouyer's motorcycle-the same motorcycle Bouyer was last seen riding at 8:59 p.m. on 20 August 2015. Evidence presented by the State showed Defendant and Stephens delivered Bouyer's motorcycle to Jones in the days after Bouyer's death, attempted to have the appearance of the motorcycle altered, and later pursued its sale or destruction.
 

 Other evidence suggested Defendant's presence at the scene where Bouyer's motorcycle was taken, in that Stephens and Defendant were last seen leaving the BP station together in Defendant's Jeep at 8:59 p.m. Stephens' cellphone was then used a total of four times within twenty-one minutes of 8:59 p.m. in the "footprint" of tower 4c4, sector 3, the cell tower and sector in which Bouyer's body was later discovered. Defendant's DNA was found on Bouyer's wallet, which in turn was discovered in Defendant's Jeep. The evidence also suggested that two guns
 
 *211
 
 were used at the scene where Bouyer's body was later found; Bouyer was killed by three shots from a shotgun, and a spent 9-millimeter shell casing was also found within one hundred yards of Bouyer's body. Forensic testing matched the spent shell casing to a Lorcin 9-millimeter handgun later found hidden in Defendant's bedroom.
 
 *43
 
 The evidence presented by the State at trial allowed a reasonable inference that Defendant participated in the robbery and larceny of Bouyer's motorcycle, and that Bouyer was killed during that robbery and larceny. To the extent that some evidence suggested Defendant was alone for a portion of the night, when visiting Graham, and tended to show that Defendant's cellphone was never used within the footprint of Tower 4c4, sector 3, these "contradictions and discrepancies [were] for the jury to resolve and [did] not warrant dismissal."
 
 Winkler
 
 ,
 
 368 N.C. at 574
 
 ,
 
 780 S.E.2d at 826
 
 . In sum, we hold that the State presented substantial evidence to allow the jury to draw a reasonable inference that Defendant was the perpetrator of robbery with a dangerous weapon and larceny.
 
 Lee
 
 ,
 
 348 N.C. at 488
 
 ,
 
 501 S.E.2d at 343
 
 . While much of this evidence was circumstantial, circumstantial evidence is all a trial court needs to deny a defendant's motion to dismiss for insufficient evidence, and it is then for the jury to resolve conflicts in the evidence and determine the defendant's guilt beyond a reasonable doubt.
 
 Winkler
 
 ,
 
 368 N.C. at 574
 
 ,
 
 780 S.E.2d at 826
 
 . The trial court did not err in denying Defendant's motion to dismiss.
 

 B.
 
 Evidence Regarding Defendant's Attempts to Hire An Attorney
 

 Defendant argues the trial court erred in allowing the introduction of evidence regarding Defendant's attempts to hire legal counsel prior to his arrest. As Defendant concedes, he failed to timely object at trial to the testimony regarding his efforts to hire an attorney. Due to that failure, the State contends that Defendant has waived all appellate review of the issue, including our review for plain error. As support for this proposition, the State cites
 
 State v. Houser
 
 ,
 
 239 N.C.App. 410
 
 , 417,
 
 768 S.E.2d 626
 
 , 632 (2015), in which this Court held that "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal, not even for plain error."
 
 Houser
 
 ,
 
 239 N.C.App. at 418
 
 ,
 
 768 S.E.2d at 632
 
 (quoting
 
 State v. Gobal
 
 ,
 
 186 N.C.App. 308
 
 ,
 
 651 S.E.2d 279
 
 (2007),
 
 aff'd per curiam
 
 ,
 
 362 N.C. 342
 
 ,
 
 661 S.E.2d 732
 
 (2008) (footnote and citations omitted)). However, our Supreme Court recently reaffirmed that where an alleged constitutional error occurs during either instructions to the jury or on evidentiary issues, an appellate court must review for plain error if it is specifically and distinctly contended:
 

 *212
 
 [W]e apply the general rule that "failure to raise a constitutional issue at trial generally waives that issue for appeal." [
 
 State v. Wilson
 
 ,
 
 363 N.C. 478
 
 , 484,
 
 681 S.E.2d 325
 
 , 330 (2009) ].
 
 Nevertheless, because the alleged constitutional error occurred during the trial court's instructions to the jury, we may review for plain error
 
 .
 
 State v. Cummings
 
 ,
 
 352 N.C. 600
 
 , 612-13,
 
 536 S.E.2d 36
 
 , 47 (2000) (quoting
 
 State v. Greene
 
 ,
 
 351 N.C. 562
 
 , 566,
 
 528 S.E.2d 575
 
 , 578,
 
 cert. denied
 
 ,
 
 531 U.S. 1041
 
 ,
 
 121 S.Ct. 635
 
 ,
 
 148 L.Ed.2d 543
 
 (2000) ("[W]e have previously decided that plain error analysis applies only to instructions to the jury and evidentiary matters.")),
 
 cert. denied
 
 ,
 
 532 U.S. 997
 
 ,
 
 121 S.Ct. 1660
 
 ,
 
 149 L.Ed.2d 641
 
 (2001).
 

 State v. May
 
 ,
 
 368 N.C. 112
 
 , 118,
 
 772 S.E.2d 458
 
 , 462-63 (2015) (emphasis added). Our Supreme Court has conducted plain error review in cases in which the defendant asserted on appeal that the introduction of evidence and testimony violated their constitutional rights, despite the lack of an objection at trial.
 
 See, e.g.
 
 ,
 
 State v. Moore
 
 ,
 
 366 N.C. 100
 
 , 104-05,
 
 726 S.E.2d 168
 
 , 172 (2012) ;
 
 State v. Raines
 
 ,
 
 362 N.C. 1
 
 , 16-17,
 
 653 S.E.2d 126
 
 , 136 (2007).
 

 In the present case, Defendant argued in his brief to this Court that admission of portions of two witnesses' testimony, admitted without Defendant's objection, was erroneous, and admission of the testimony violated his Sixth Amendment rights. Since this argument is rooted in an "evidentiary matter[ ],"
 
 Greene
 
 ,
 
 351 N.C. at 566
 
 ,
 
 528 S.E.2d at 578
 
 , we consider whether introduction of this evidence amounted to plain error.
 
 [2]
 

 See
 

 *44
 

 State v. Garcell
 
 ,
 
 363 N.C. 10
 
 , 53,
 
 678 S.E.2d 618
 
 , 645 (2009) ; N.C. R. App. P. 10(a)(4). The plain error rule
 

 is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "
 
 fundamental
 
 error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair
 
 *213
 
 trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the ... mistake had a probable impact on the jury's finding that the defendant was guilty."
 

 Cummings
 
 , 352 N.C. at 616,
 
 536 S.E.2d at 49
 
 (alterations in original) (quoting
 
 State v. Odom
 
 ,
 
 307 N.C. 655
 
 , 660,
 
 300 S.E.2d 375
 
 , 378 (1983) ). To prevail, a defendant must show "not only that there was error, but that absent the error, the jury probably would have reached a different result."
 
 State v. Haselden
 
 ,
 
 357 N.C. 1
 
 , 13,
 
 577 S.E.2d 594
 
 , 602 (2003) (internal quotation marks and citation omitted).
 

 Defendant contends the State improperly elicited statements from two witnesses regarding his attempts to hire a lawyer, and that these statements likely affected the jury's verdict. First, one of the law enforcement officers involved in the case, Lieutenant Andrew Hanchey ("Lt. Hanchey"), explained from the witness stand that a notepad was among the evidence recovered during a search of Defendant's wife's car. At the prompting of the prosecutor, Lt. Hanchey testified that the notepad contained a note which read "lawyers to call" and listed the names of several law firms. Second, McGowan, the clerk at the BP station, was asked by the prosecutor to recall all instances in which she had seen Defendant and Stephens after Bouyer's body had been discovered. McGowan recounted her last encounter with Defendant:
 

 [Prosecutor:] ... [W]hen was the next time you saw [Defendant]?
 

 [McGowan:] He came in the store. I'm not sure the date, but it's the date that he got arrested. He came in the store. I was working second shift that day, and he had a little, yellow notepad, and he was trying to get me to write my name and my address and stuff down, because he said that they were going to get a lawyer and, you know, "Put your information down right here so we can go get this lawyer."
 

 [Prosecutor:] Did you agree to do that?
 

 [McGowan:] No.
 

 [Prosecutor:] Why not?
 

 [McGowan:] I told [Defendant] that I didn't need a lawyer, that guilty people need a lawyer, and I wanted him to leave me alone.
 

 *214
 
 This particular exchange ended that day's testimony; except for mentioning the exchange as a reference point for resuming McGowan's testimony the following day, the prosecutor did not ask any additional questions regarding Defendant's attempts to hire an attorney.
 

 The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. CONST. Amend. VI. This fundamental right was made applicable to the States through the Fourteenth Amendment,
 
 see, e.g.
 
 ,
 
 McMann v. Richardson
 
 ,
 
 397 U.S. 759
 
 ,
 
 90 S.Ct. 1441
 
 ,
 
 25 L.Ed.2d 763
 
 (1970) ;
 
 State v. Wise
 
 ,
 
 64 N.C.App. 108
 
 ,
 
 306 S.E.2d 569
 
 (1983), and includes the right of an accused to select an attorney of his or her choice.
 
 State v. Yelton
 
 ,
 
 87 N.C.App. 554
 
 , 559,
 
 361 S.E.2d 753
 
 , 757 (1987). Our Supreme Court has held that "there are 'no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it[;] [t]he value of constitutional privileges is largely destroyed if persons can be penalized for relying on them.' "
 
 State v. Ladd
 
 ,
 
 308 N.C. 272
 
 , 284,
 
 302 S.E.2d 164
 
 , 172 (1983) (quoting
 
 Grunewald v. United States
 
 ,
 
 353 U.S. 391
 
 , 425,
 
 77 S.Ct. 963
 
 , 984-85,
 
 1 L.Ed.2d 931
 
 , 955 (1957) (Black, J., concurring)).
 

 We have no difficulty concluding that the two exchanges violated Defendant's Sixth Amendment right to counsel, and should not
 
 *45
 
 have been admitted into evidence. Lt. Hanchey's statement served no purpose other than to inform the jury that Defendant had attempted to hire an attorney prior to his arrest. Likewise, McGowan's opinion that only "guilty people need a lawyer" is the epitome of using "a constitutional privilege to discredit or convict a person who asserts it."
 
 Ladd
 
 ,
 
 308 N.C. at 284
 
 ,
 
 302 S.E.2d at 172
 
 . Having determined that admission of these statements was error, we consider whether admission of these statements amounted to plain error. We hold that it did not.
 

 A review of the transcript reveals that, while the prosecutor in this case elicited Lt. Hanchey's testimony regarding the "lawyers to call" note, the prosecutor did not emphasize or highlight Defendant's exercise of his rights, and questioning immediately moved on to other subjects. With regard to McGowan's testimony that "only guilty people need lawyers," we note that the prosecutor's question which elicited this response was relatively innocuous-the prosecutor merely asked McGowan why she declined to give Defendant her contact information. After McGowan gave her inflammatory answer, the prosecutor declined to capitalize on or to emphasize McGowan's comments.
 
 See
 

 Moore
 
 ,
 
 366 N.C. at 106-107
 
 ,
 
 726 S.E.2d at 173-74
 
 (holding that statements of a witness regarding the defendant's invocation of his constitutional rights did not amount to
 
 *215
 
 plain error where the prosecutor "did not emphasize, capitalize on, or directly elicit [the witness's] prohibited responses");
 
 State v. Alexander
 
 ,
 
 337 N.C. 182
 
 , 196,
 
 446 S.E.2d 83
 
 , 91 (1994) (finding no plain error where the prosecutor asked a State's witness, a police officer, if the defendant spoke or talked to him, and noting that the comments were "relatively benign" and that the prosecutor did not emphasize that the defendant did not speak with law enforcement after his arrest). Given the passing nature of these statements, the lack of emphasis or detailed discussion of these comments by the prosecutor, and the voluminous amount of other testimony and evidence received throughout this case, we do not believe the statements by Lt. Hanchey and McGowan "had a probable impact on the jury's finding that [D]efendant was guilty."
 
 Cummings
 
 , 352 N.C. at 616,
 
 536 S.E.2d at 49
 
 . Therefore, admission of the testimony was not plain error.
 

 C.
 
 Failure to Arrest Judgment/Vacatur of Underlying Felonies
 

 Defendant next argues the trial court erred by failing to arrest judgment on all of the felonies underlying his felony first-degree murder conviction. The State concedes the error, but maintains the proper remedy is to arrest judgment on Defendant's robbery with a dangerous weapon conviction, and vacate the larceny and possession of stolen goods convictions.
 

 In its verdict, the jury indicated it had determined that the robbery with a dangerous weapon, larceny, and possession of stolen goods convictions served as the predicate felonies underlying Defendant's conviction for first-degree felony murder. Our Supreme Court has held that when a defendant is convicted of felony murder, "the underlying felony supporting a conviction for felony murder merges into the murder conviction. The underlying felony provides no basis for an additional sentence, and any judgment imposed thereon must be arrested."
 
 State v. Barlowe
 
 ,
 
 337 N.C. 371
 
 , 381,
 
 446 S.E.2d 352
 
 , 358-59 (1994) ;
 
 see also
 

 State v. Millsaps
 
 ,
 
 356 N.C. 556
 
 , 560,
 
 572 S.E.2d 767
 
 , 770 (2002) (noting that conviction of the underlying felony "constitutes an element of first-degree murder," requiring merger for sentencing purposes). Following this rule in the present case, we find the trial court erred in failing to arrest judgment on Defendant's conviction for robbery with a dangerous weapon.
 

 Normally, "[o]nly one underlying felony is necessary to support a felony-murder conviction[.]"
 
 Barlowe
 
 , 337 N.C. at 381, 446 S.E.2d at 358. While the merger rule "requires the trial court to arrest judgment on at least one of the underlying felony murder convictions
 
 if two separate convictions
 
 supported the conviction for felony murder," the trial court
 
 *216
 
 is permitted to use its "discretion to select which felony conviction would serve as the underlying felony."
 
 State v. Ridgeway
 
 ,
 
 185 N.C.App. 423
 
 , 437,
 
 648 S.E.2d 886
 
 , 896 (2007) (emphasis added) (citations and internal quotation marks omitted). The
 
 *46
 
 other felony convictions are not required to be arrested under the merger rule.
 

 Id.
 

 Application of this rule would suggest that a remand to the trial court is necessary for it to exercise discretion in choosing which of the three felonies on which to arrest judgment. However, remand for this purpose is not needed in the present case because the three felonies underlying Defendant's first-degree murder conviction are not "separate convictions." Defendant's convictions for robbery with a dangerous weapon, larceny, and possession of stolen goods all related to the same event-the taking and subsequent possession of Bouyer's motorcycle. Our Supreme Court has held that felony larceny is a lesser-included offense of robbery with a dangerous weapon when both charges stem from the same taking.
 
 See
 

 State v. Cobb
 
 ,
 
 150 N.C.App. 31
 
 , 43,
 
 563 S.E.2d 600
 
 , 609 (2002) (citing
 
 State v. White
 
 ,
 
 322 N.C. 506
 
 , 518,
 
 369 S.E.2d 813
 
 , 819 (1988) ). A trial court "violate[s] federal and state constitutional principles against double jeopardy," when it sentences a defendant for a robbery with a dangerous weapon and larceny arising out of the same taking, and the proper remedy is to arrest judgment on the larceny conviction.
 
 State v. Jaynes
 
 ,
 
 342 N.C. 249
 
 , 276,
 
 464 S.E.2d 448
 
 , 465 (1995) (citing
 
 State v. Adams
 
 ,
 
 331 N.C. 317
 
 , 333,
 
 416 S.E.2d 380
 
 , 389 (1992) ).
 

 Similarly, our Supreme Court has held that while "[l]arceny and possession of property stolen in the larceny are separate crimes" because "[e]ach crime requires proof of an additional fact which the other does not," our General Assembly "did not intend to punish an individual for receiving or possession of the same goods that he stole."
 
 State v. Perry
 
 ,
 
 305 N.C. 225
 
 , 234-37,
 
 287 S.E.2d 810
 
 , 815-17 (1982),
 
 overruled in part on other grounds by
 

 State v. Mumford
 
 ,
 
 364 N.C. 394
 
 , 402,
 
 699 S.E.2d 911
 
 , 916 (2010) ;
 
 see also
 

 State v. Moses
 
 ,
 
 205 N.C.App. 629
 
 , 640,
 
 698 S.E.2d 688
 
 , 696 (2010) (noting that the "Legislature ... did not intend to subject a defendant to multiple punishments for both robbery and the possession of stolen goods that were the proceeds of the same robbery"). In
 
 Perry
 
 , a case in which the defendant was convicted of both larceny and possession of the goods stolen in that larceny, our Supreme Court chose to vacate the possession of stolen goods conviction, rather than arrest judgment on that conviction.
 
 Perry
 
 ,
 
 305 N.C. at 237
 
 ,
 
 287 S.E.2d at 817
 
 . Following
 
 Perry
 
 , we do the same in the present case.
 

 *217
 
 III.
 
 Conclusion
 

 The State presented "substantial evidence" that Defendant was the perpetrator of the crimes for which he was charged and convicted, and the trial court did not err in denying Defendant's motion to dismiss the charges of first-degree felony murder, robbery with a dangerous weapon, and larceny. The trial court erred in admitting the two statements elicited by the State regarding Defendant's attempts to hire an attorney. Those statements violated Defendant's Sixth Amendment right to counsel. However, given the passing nature of those statements, the circumstances in which they arose, and the voluminous other evidence presented against Defendant in the course of his trial, we conclude that the error did not likely affect the jury's verdict and for that reason did not amount to plain error.
 

 Regarding Defendant's sentencing, the trial court's judgment of life in prison without the possibility of parole corresponding with Defendant's conviction for first-degree felony murder remains undisturbed. However, we arrest judgment on Defendant's convictions for robbery with a dangerous weapon and larceny, and vacate Defendant's conviction for possession of stolen goods.
 

 NO ERROR IN PART; NO PLAIN ERROR IN PART; JUDGMENT ARRESTED IN PART; VACATED IN PART.
 

 Judges STROUD and INMAN concur.
 

 [1]
 

 While Defendant concedes there was substantial evidence that he committed the crime of possession of stolen goods, he argues that possession of stolen goods may never serve as the predicate felony for a felony first-degree murder conviction. Because we determine the State presented substantial evidence on the robbery with a dangerous weapon and larceny charges, we do not address this argument.
 

 [2]
 

 To be entitled to plain error review, a defendant must "specifically and distinctly contend that the alleged error constituted plain error."
 
 State v. Lawrence
 
 ,
 
 365 N.C. 506
 
 , 516,
 
 723 S.E.2d 326
 
 , 333 (2012). Here, Defendant has done so; therefore, we proceed to a plain error analysis.