An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-873

Filed 5 November 2025

Wake County, No. 21CR205416-910

STATE OF NORTH CAROLINA

       v.

ERICK GAEL HERNANDEZ-MENDEZ

Appeal by defendant from judgment entered 13 March 2024 by Judge Keith O. Gregory in Wake County Superior Court. Heard in the Court of Appeals 21 May 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Michael T. Henry, for the State.*
>
> *Marilyn G. Ozer for defendant.*

FREEMAN, Judge.

Defendant appeals from judgment entered upon a jury verdict finding him guilty of first-degree murder. On appeal, defendant argues the trial court erred in (1) admitting testimony of an overheard phone call made by the victim; and (2) excluding testimony of statements made by defendant's roommate about being good with

knives. After careful review, we conclude that defendant received a fair trial free from prejudicial error.

## I. Factual and Procedural Background

The evidence presented at trial tended to show the following. Defendant and Kailey Lynch had been friends since childhood. In the summer of 2020, defendant met Christina Matos. Kailey and Christina had been friends since middle school but went through periods when they did not speak to each other. Defendant, Kailey, and Christina graduated from the same high school in 2020.

Defendant was a gay man who moved to the United States from Mexico when he was a toddler; he was not a United States citizen. After graduating from high school, defendant took classes at Johnston Community College and Liberty University online and worked 80 hours per week at a yarn plant.

In August 2020, Kailey and Christina moved into apartment 220 at the Signature 1505 apartment building near the North Carolina State University campus. The apartment had four separate bedrooms and a common kitchen and living area. Each bedroom was leased and locked individually. The remaining two rooms were occupied by Jayda Kerlew and Reagan Orr, who were assigned to live in apartment 220 through the apartment building's roommate selection process. The four roommates had a tense relationship: Jayda and Reagan repeatedly contacted apartment management to complain about Kailey and Christina's behavior.

Around December 2020, defendant told Christina that he wanted to obtain a

green card. To help him do so, Christina agreed to marry him; in return, defendant promised to pay her $10,000 or $15,000.[1] In January 2021, defendant moved into Christina's room, Room B after the two signed a double occupancy lease. Defendant and Christina lived together platonically, and defendant started paying half of Christina's rent. In March 2021, Jayda and Reagan moved out of the apartment.

Christina and defendant texted about the money multiple times in February 2021. In these text conversations, Christina expressed that she wanted the money that defendant had promised to pay her. On 24 February, Christina texted defendant, "you gotta give me what you told me you would," and that he had "pushed" paying her "back two days." Christina further texted that she "wanted the full thing," and she didn't "have any money." Christina asked defendant to "transfer all on Apple Pay," but defendant said he would have to go to the bank but confirmed "[e]verything is in my account."

Records from defendant's financial history showed that on 26 February 2021, defendant withdrew $2,750 from his savings account, leaving a balance of approximately ten dollars. On 25 March 2021, defendant's balance was $1,844.33 after a sixty-dollar withdrawal.

Around this time, tensions continued to rise between defendant, Christina, and Kailey. Defendant started to side with Kailey in arguments, which made Christina

---

[1] Christina's brother Abraham Matos testified that Christina was being paid $10,000 to marry defendant, while defendant testified that he agreed to pay Christina $15,000.

feel "betrayed" and upset with both defendant and Kailey. Christina planned to move out when her lease ended.

On 20 March 2021, defendant searched online, "What happens if my U.S. citizen wife dies?" and found an article detailing the green card process after the sponsor dies. On 29 March, defendant married Christina. That same day, Christina moved into a different room in the apartment, Room D. After they married, Christina told defendant they would not be friends until he was no longer friends with Kailey, and that she was "only doing strictly business" with him. Christina told defendant he should only contact her if he needed "something specific."

Christina was murdered on the morning of 3 April 2021. Kailey left the apartment around 9:17 a.m. to go to work. Around 11:30 a.m., defendant left the apartment and disposed of trash bags in the apartment building trash chute. Defendant left the apartment building at noon. He returned to the apartment around 3:25 p.m.

Christina's friend Jordan Phillips repeatedly texted Christina and received no response. On 4 April 2021, Jordan contacted law enforcement to report that Christina was missing. When Christina's family learned from the police that Christina had been reported missing, her mother and brother, Abraham Matos, traveled to the apartment. When they arrived, no one else was in the apartment. Abraham had a spare key to Room B from when Christina first moved in but could not enter any of the other bedrooms. After looking around the apartment, Abraham found a

Walgreens receipt showing that bleach, cleaning supplies, and cold medicine had been purchased on 3 April 2021 at 2:55 p.m. Abraham unlocked and entered Room B, but found it was defendant's room. After searching the apartment, Abraham went to the parking lot to look for Christina's car. Once outside, he met Jordan. They went back inside the apartment to look around again, and they called defendant.

Christina's family and Jordan asked defendant which room was Christina's. Defendant told them that he was unsure whether she lived in Room A or Room B, and he was worried about her. Defendant asked them to wait until he got home to search the apartment.

The police called Jordan and spoke to Abraham on the phone. The police officer told Abraham that if his daughter were missing, he would break down the door. Abraham broke down the door to Room A, believing it to be Christina's but found it was Kailey's room. Christina's family and Jordan then went out to the parking lot to wait for law enforcement to arrive. Before law enforcement arrived, defendant returned to the apartment and met Christina's family and Jordan. Defendant asked if the group had heard anything from Christina and told them he last saw her around 9:00 in the morning on April 3.

Captain Matt VanAntwerp and Lieutenant Batton of the Raleigh Police Department arrived at the apartment building. After obtaining keys to all the individual rooms in the apartment, they searched the apartment.

When they entered Room D, they found Christina's body lying on the floor in a

pool of dried blood. Christina's body had numerous cuts and sixteen stab wounds on her head and neck. Both the left and right jugular veins were completely transected, and there were multiple holes in the left jugular vein which indicated that a sharp object penetrated the vein multiple times. There were many cuts on her hands and wrists, some of which were on her palms, indicating that she may have grabbed the knife during the attack. Christina was missing several acrylic nails. Christina died of blood loss from the severing of the jugular veins.

Footage from the apartment building's surveillance system showed that the only other people in the apartment at the approximate time of Christina's murder were defendant and Kailey. The footage also showed defendant disposed of trash bags in the apartment building trash chute. Investigators located the two bags. They contained a cell phone, a cell phone case, gloves and tissues with "suspected blood" on them, cold medicine packaging, and a white takeout container with "Kailey" written on it.

Detective Wilbur O'Neal of the Raleigh Police Department testified that shortly after Christina's murder, defendant told him that he never gave Christina more than $280.00. When he asked whether defendant intended to pay Christina the money for the marriage, defendant laughed and said, "As if I had that type of money."

Defendant was arrested on 7 April 2021 for the murder of Christina. On 19 April 2021, defendant was indicted on the charge of first-degree murder. Defendant's matter came on for trial on 26 February 2024.

During trial, defendant testified to his version of events. He reported hearing "banging on the walls" in Christina's room and went to check on her. When defendant went into Christina's room, he saw Kailey stabbing Christina. Defendant grabbed Kailey and threw her off Christina, then Kailey charged at him with the knife. Defendant tossed Kailey out of the room. Defendant then held Christina as she was dying. Defendant testified that he wanted to seek help, but Christina told him, "No, let me die."

After Christina died, defendant locked her body in her room. He then confronted Kailey. Defendant asked Kailey what she was thinking, and Kailey responded that she was "so tired of [Christina] always trying to get away with everything," so she "just went ahead and did it[,]" because Christina "was going to die either way." Kailey then threatened to hurt his family if he did not help her "clean up." By Kailey's demand, defendant cleaned up the room and threw away Christina's phone and broken nails. Defendant testified that Kailey's threat scared him so much that he did not tell his version of events until two years after Christina was murdered, and only after Kailey was arrested as an accessory after the fact. Defendant took Kailey's threat seriously because he knew that "she beat up her own mother . . . to the ground" and that Kailey was "violent towards other people." He testified he did not let Kailey go back into Christina's room.

Defendant kept the key to Christina's room with him throughout the following days. On 3 April, defendant bought bleach, cleaning supplies, and cold medicine from

Walgreens. He told his mother that he was not feeling well. At Kailey's suggestion "to support [defendant's story]," he and Kailey went to a drug store to buy cold medicine as "part of a plan that [defendant and Kailey] made up."

On Sunday, 4 April, defendant went to his parents' house in Clayton. As he was preparing to leave their house to go to work, he received a phone call from Christina's brother. Before he left, he threw away Christina's key chain in his parents' garbage bin and threw the bedroom key under their house. Defendant testified that he knew Christina was in Room D but lied because he did not want Christina's family "to see her body laying there dead." After defendant took Christina's family and Jordan back to the apartment, he excused himself to use the restroom. But instead of using the restroom, defendant put bloody gloves and Christina's phone in a trash bag and threw the bag away in the trash chute.

Defendant maintained that he needed Christina alive to go through the immigration process. Defendant testified that he searched "what happens if my U.S. citizen wife dies?" because he was concerned that Christina might commit suicide. Defendant also testified that he paid Christina over $4,000 before they were married, and he planned to pay her $1,000 per month until he paid her the full amount. Defendant testified that he paid her $1,000 in March but did not pay her in April because he needed to go to the bank.

Defendant also described Kailey to Detective O'Neal as "a little princess charming . . . but with an explosive attitude" and detailed an incident where Kailey

was livid at Christina for eating one of Kailey's muffins, culminating in Kailey throwing the empty muffin container at Christina's bedroom door.

The State sought to introduce testimony from Reagan regarding a phone call she had overheard between Christina and Kailey while she still lived in apartment 220. During the voir dire examination, Reagan said she overheard Christina make a speakerphone call to Kailey after Christina found defendant's diary that detailed sexually explicit fantasies about Christina. Reagan said that Kailey and Christina were both "shocked" by this discovery, and that Christina was "cussing, yelling, talking fast, just in a panicked state."

Defendant objected to the admission of this testimony on the basis that it was inadmissible hearsay, "extremely prejudicial," and violated the Confrontation Clause of the United States Constitution. The State contended that it was not offered for the truth of the matter asserted and thus not hearsay, and if it were hearsay, it was a present sense impression and an excited utterance. Ultimately, the trial court overruled defendant's objection on the basis of the Confrontation Clause. The trial court concluded that the testimony was "being offered for present sense impression, . . . [and for] excited utterance." The trial court further concluded that "the probative value outweighs any prejudicial effect that this would have."

At trial, Reagan similarly testified about Christina's reaction to finding defendant's diary, and described Christina as sounding "confused, yelling, super panicked" because of "what she just found." Reagan described this event as "the final

straw" that caused her to move out of the apartment. Defendant renewed his objection to admitting Reagan's testimony "under the United States Constitution Confrontation Clause."

Defendant sought to introduce testimony of Gabrielle Mueller, one of Kailey's roommates in February 2023. Gabrielle testified during voir dire examination that on one occasion, Kailey lost her phone in a rideshare vehicle. While waiting for the police to call about the phone, Kailey grabbed "the biggest knife in the drawer" and waved it around saying, "I'm going to go get it . . . I'm good with knives. I'm known for being good with knives." Gabrielle stated that Kailey had threatened to fight whoever stole her phone. When Kailey, Gabrielle, and another roommate went to collect Kailey's phone, Kailey tried to bring the knife with her, but Gabrielle stopped her from bringing it.

The State objected to the admission of Gabrielle's testimony, arguing that it was inadmissible character evidence, hearsay without an exception, and irrelevant. Defendant maintained that it was relevant to Kailey's "identity" and "technique" of "picking up a knife and going after someone." Defendant further argued that it was not hearsay, as it proved the effect of the statement on Gabrielle rather than the truth of the matter asserted; if it were hearsay, then it was admissible as a statement against Kailey's penal interest. The trial court concluded that the statements were hearsay without an exception and inadmissible under Rule 404(b). The trial court reasoned:

> This is a specific instance that this witness wants to refer to. That's not the purpose of character evidence. She can talk about reputation . . . .
>
> . . .
>
> My understanding is that she's testifying to something that may have occurred two or three years later on a separate incident dealing with a cell phone and [Kailey's] reaction to her cell phone potentially being taken and/or stolen. In that she may have been waving a knife around not near anybody as far as the person she thought had stolen the phone . . . . I don't see how the effect on the listener—why that's pertinent that the jury should hear this statement.

At trial, Gabrielle testified that she was Kailey's roommate from August 2022 until May 2023. Gabrielle explained an "incident" involving Kailey made it "not safe" for her to continue live with Kailey anymore and prompted her to move out. Further, Gabrielle reported that incident to the police. Gabrielle testified that, in her opinion, Kailey "wasn't able to tell the truth very much."

On 13 March 2024, the jury found defendant guilty of first-degree murder. The trial court sentenced defendant to life in prison without the possibility of parole. Defendant gave notice of appeal in open court.

## II. Jurisdiction

This Court has jurisdiction to hear an appeal from a final judgment of a superior court. N.C.G.S. §§ 7A-27(b), 15A-1444(a) (2023). Accordingly, we have jurisdiction over defendant's appeal of right.

## III. Standard of Review

"The standard of review for admission of evidence over objection is whether it

was admissible as a matter of law, and if so, whether the trial court abused its discretion in admitting the evidence." *State v. Clawson*, 291 N.C. App. 234, 240 (2023) (citation omitted). The trial court abuses its discretion when its "ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* We review "alleged constitutional errors in the admission of testimony in violation of the Confrontation Clause de novo." *State v. Pabon*, 380 N.C. 241, 252 (2022).

## IV. Discussion

Defendant argues that the trial court erred in (1) admitting Reagan's testimony about overhearing Christina's phone call; and (2) excluding Gabrielle's testimony about Kailey waving a knife while saying, "I'm known for being good with knives." We address each argument in turn.

### A. Admission of Reagan's Testimony

Defendant contends that the trial court erred by admitting Reagan's testimony about the phone call she heard between Christina and Kailey. Specifically, defendant argues this evidence violated his rights under the Confrontation Clause because the State did not show that Kailey was unavailable to testify. Defendant also challenges the admission of Reagan's testimony under the best evidence rule, as an excited utterance, and under the Rule 403 balancing test. We address each argument in turn.

#### 1. *Confrontation Clause*

Defendant argues that the admission of Reagan's testimony violated his rights

under the Confrontation Clause of the Constitution.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. "Testimonial statements of witnesses absent from trial [are] admitted only where the *declarant* is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004) (emphasis added); *accord State v. Morgan*, 359 N.C. 131, 153–54 (2004). "Where non-testimonial evidence is involved, however, the ordinary rules of evidence apply in regards to admissibility." *State v. Ferebee*, 177 N.C. App. 785, 788 (2006). A testimonial statement includes material "that declarants would reasonably expect to be used prosecutorial," which could include statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Crawford*, 541 U.S. at 51–52 (cleaned up).

Here, defendant argues that "the State made no showing that Kailey was unavailable[,]" so the speakerphone conversation that Reagan overheard between Christina and Kailey was inadmissible. But Reagan's testimony was limited to what she heard *Christina* say while Christina was on the phone with Kailey—not what Kailey said. Reagan described Christina as "very panicked . . . yelling, just cursing, wondering what she had just found, what happened." She did not testify at trial about Kailey's statements during this phone call: Reagan merely identified Kailey as the recipient of Christina's phone call. Based on Reagan's testimony, Christina was

reacting to her discovery of the diary's contents and discussing that discovery with her roommate. Christinia's statements were not made for the purpose of establishing in a later trial that defendant had a diary containing explicit fantasies about her, but instead to express that she was upset by what she had read. Thus, the statements were not testimonial and do not implicate defendant's rights under the Confrontation Clause regardless of Kailey's unavailability.

### 2. *Evidentiary Rulings*

Defendant argues that the trial court erred in admitting Reagan's testimony under the best evidence rule, as an excited utterance, and under the Rule 403 balancing test.[2] Though defendant raised these arguments during the voir dire examination, defendant did not renew his objection to the admission of Reagan's testimony on these bases at trial. Accordingly, these arguments are not preserved on appeal. *See* N.C. R. App. P. 10(a)(1); *State v. Oglesby*, 361 N.C. 550, 554 (2007) ("a trial court's evidentiary ruling on a pretrial motion is *not* sufficient to preserve the issue of admissibility for appeal unless a defendant renews the objection during trial.").

Even if these arguments were preserved, the trial court did not err. First, the

---

[2] Defendant also argues for the first time in his reply brief that "[t]he trial court erred by allowing the State to introduce unsubstantiated evidence without giving a limiting instruction[.]" Defendant has abandoned this argument by not presenting it in his opening brief. *See Larsen v. Black Diamond French Truffles, Inc.*, 241 N.C. App. 74, 79 (2015) ("[W]here a party fails to assert a claim in its principal brief, it abandons that issue and cannot revive the issue via reply brief.").

best evidence rule is inapplicable in the present case where the State did not seek to introduce the diary to prove its contents, but to show an event contributing to the deterioration of Christina's and defendant's friendship shortly before her death. *See* N.C.G.S. § 8C-1, Rule 1002 (2023) (The best evidence rule requires the original document be produced to "prove the content of a writing."); *see also State v. Clark*, 324 N.C. 146, 156 (1989) ("The best evidence rule applies only when the contends of a writing are in question."). Second, even if the trial court erred in admitting Reagan's testimony as an excited utterance, the trial court also admitted Reagan's testimony as a present sense impression, which defendant does not challenge on appeal. *See* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which or argument is stated, will be taken as abandoned."). Third, defendant does not argue the trial court abused its discretion in balancing the evidence under Rule 403 balancing, but instead asks this court to re-weigh the evidence. *See State v. Richardson*, 385 N.C. 101, 147 (2023) ("On appellate review, we will reverse a trial court's decision to admit evidence after undertaking the Rule 403 balancing determination only where an abuse of discretion is *demonstrated*." (emphasis added)).

But even if the trial court had erred by admitting Reagan's testimony, the error must be prejudicial. "A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result

would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2023).

There is no reasonable possibility that a different outcome would have resulted had Reagan's testimony been excluded. The State presented ample evidence from which the jury could have concluded that defendant, not Kailey, killed Christina. Defendant had agreed to pay Christina at least $10,000 or $15,000 because Christina married him. Text messages between defendant and Christina showed that their friendship had soured in the several weeks before Christina was murdered. Further, Christina's friend Jordan testified that Christina was upset with both defendant and Kailey shortly before she died.

Defendant also researched how Christina's death would impact his citizenship process days before she was killed. Defendant alone cleaned up Christina's room and threw away evidence of his involvement. He exclusively possessed the key to Christina's room after she was killed. Defendant lied to Christina's family and the police for two years, despite having multiple opportunities to explain what happened and to tell the police about Kailey's alleged threat against his family.

In light of this overwhelming evidence, Reagan's brief testimony that Christina was "panicked" after finding defendant's diary that detailed sexual stories about Christina could not have impacted the outcome at trial. Accordingly, there is no reasonable possibility that absent Reagan's testimony, the jury would have acquitted defendant, so the trial court did not prejudicially err by admitting it.

## B. Exclusion of Gabrielle's Testimony

Next, defendant contends that the trial court erred in excluding Gabrielle's testimony as Rule 404(b) character evidence. Defendant further argues that the exclusion of Gabrielle's testimony violated his constitutional right to present a complete defense.

As an initial matter, defendant contends that the trial court erred by not admitting Gabrielle's hearsay testimony under the statement against interest exception to the hearsay rule. *See* N.C.G.S. § 8C-1, Rule 804(b)(3). Aside from asserting that "[t]he trial court's ruling was erroneous" under Rule 804(b)(3), and reiterating defendant argued below that Gabrielle's testimony was admissible as a statement against interest, defendant makes no argument on appeal explaining the trial court's purported error. Accordingly, defendant has abandoned this argument on appeal. *See* N.C. R. App. P. 28(b)(6). ("Issues not presented in party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

### 3. *Rule 404(b)*

Defendant contends that Gabrielle's testimony should have been admitted under Rule 404(b). Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show that he acted in conformity therewith." N.C.G.S. § 8C-1, Rule 404(b) (2023). This evidence may be admitted for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment, or accident." *Id.* However,

Rule 404(b) evidence must be otherwise admissible. Because the trial court determined that Gabrielle's testimony was hearsay without an exception, and defendant abandoned any argument to the contrary, the testimony was inadmissible irrespective of the trial court's determination of whether it was admissible for purposes other than establishing Kailey's character.

However, even if the trial court erred by excluding Gabrielle's testimony, the error was not prejudicial. *See* N.C.G.S. § 15A-1443(a). As discussed above, the State presented ample evidence to support its argument that defendant was the one who murdered Christina. Further, there was testimony presented at trial that demonstrated Kailey's aggressive temperament and her deteriorating relationship with Christina. For instance, defendant testified about a time with Kailey hit her own mother, and another time where Kailey became irate at Christina after she ate one of Kailey's muffins. Jordan Phillips testified that Christina was upset with Kailey before her murder. And Gabrielle herself testified that an incident with Kailey caused her to move out of their apartment that made it unsafe for her to live there. Thus, Gabrielle's account that over two years after Christina was murdered, Kailey waved a knife around and said that she was "known for being good with knives" does little to establish her viability as the one who murdered Christina. Accordingly, defendant cannot show that absent the exclusion of Gabrielle's testimony about Kailey and the knife there is a reasonable possibility that the jury would have reached a different result.

### 4. *Constitutional Right to Present a Defense*

Defendant argues that excluding testimony about Kailey waving around a knife violated his constitutional right to present a defense. Essentially, defendant contends that the trial court's evidentiary errors deprived him of a fundamentally fair trial by abridging his right to present a defense.

However, defendant did not argue below that the trial court's exclusion of Gabrielle's testimony violated his constitutional rights. "In order to preserve an argument for appellate review, a party must have presented to the trial court a timely request, objection, or motion, . . . [and] obtain a ruling upon the party's request or motion." N.C. R. App. P. 10(a)(1). "[T]he failure to raise a constitutional issue at trial generally waives that issue for appeal[.]" *State v. Wilson*, 363 N.C. 478, 484 (2009).

Unpreserved issues may be reviewed for plain error "when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence." *State v. Gregory*, 342 N.C. 580, 584 (1996). However, when the constitutional issue arises from an alleged instructional or evidentiary matter, then we may review the alleged constitutional error for plain error. *See State v. May*, 368 N.C. 112, 118 (2015) ("[B]ecause the alleged constitutional error occurred during the trial court's instructions to the jury, we may review for plain error."); *State v. Stroud*, 252 N.C. App. 200, 211 (2017) (applying plain error review to an unpreserved constitutional argument because it was "rooted in an evidentiary matter[.]" (cleaned up)). Because defendant's unpreserved constitutional argument stems from an

alleged evidentiary error, and defendant requested plain error review in his appellate brief, we may review it for plain error.

A defendant must satisfy a three-step test to show that plain error was committed below.

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings.

*State v. Reber*, 386 N.C. 153, 158 (2024) (cleaned up). The second step—that a jury probably would have returned a different verdict absent the error—"requires a showing that the outcome is significantly more likely than not." *Id.* at 159 (cleaned up).

A defendant's right to present relevant evidence in his defense "is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). Thus, evidentiary rules "do not abridge an accused's rights to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (cleaned up). Excluding a defendant's evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed on a weighty interest of the accused." *Id.* The exclusion of evidence is only unconstitutional when the exclusion "significantly undermined fundamental

elements of the defendant's defense." *Id*. at 315.

For the reasons discussed above, even with the exclusion of Gabrielle's testimony about Kailey wielding the knife, defendant was still able to present evidence to establish Kailey's violent nature and conflict with Christina, and defendant testified at length about how Kailey murdered Christina. Thus, the trial court did not prejudicially err, let alone plainly err, by excluding Gabrielle's testimony about Kailey and the knife.

## V. Conclusion

The trial court did not err by admitting Reagan's testimony about the phone call she overheard Christina make, nor did this admission violate defendant's right under the Confrontation Clause. The trial court did not err by excluding Gabrielle's testimony about the knife incident involving Kailey.

NO ERROR.

Judges ZACHARY and GORE concur.

Report per Rule 30(e).